Christopher J. SPREITZ, Petitioner,

v.

Charles L. RYAN, et al.,[1] Respondents.

No. CV 02–121–TUC–JMR.

United States District Court,
D. Arizona.

May 12, 2009.

---

1. Charles L. Ryan, Interim Director of the Arizona Department of Corrections, is substituted for his predecessor pursuant to Fed. R.Civ.P. 25(d)(1).

Sean H. Bruner, Attorney at Law, Susan Bryson Fox, Advocates Law Group LLP, Tucson, AZ, for Petitioner.

Donna Jeanne Lam, Office of The Attorney General, Tucson, AZ, for Respondents.

## MEMORANDUM OF DECISION AND ORDER

JOHN M. ROLL, Chief Judge.

Christopher J. Spreitz (Petitioner) has filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. (Dkt. 38.)[2] For the reasons set forth herein, the Court deter-

2. "Dkt." refers to the documents in this Court's file.

mines that Petitioner is not entitled to habeas relief.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of May 19, 1989, Petitioner was stopped by police because his car was smoking and leaking oil.[3] His arms, legs, and shirt were smeared with blood and fecal matter, and he claimed he had been in a fight with another man. The officers asked Petitioner to accompany them to the scene of the fight. Petitioner agreed, but upon arrival there was no sign a fight had taken place. Another officer was brought in to take pictures of Petitioner, who consented to being photographed. Although the officers could smell beer on Petitioner's breath, they did not believe he was impaired and released him with a repair order for his car.

Several days later, the naked and decomposing body of Ruby Reid was found in the desert on the outskirts of Tucson. At the scene, police officers observed tire tracks, oil stains, feces-stained pants, and a torn brassiere. Two blood-stained rocks lay next to the body.

Two days after the body's discovery, during a chance encounter at the police station, the investigating detective discussed the Reid case with the officer who had taken photographs of Petitioner during the traffic stop. Believing Petitioner may have been involved with Reid's death, the police executed an arrest warrant for outstanding traffic citations. While in custody, Petitioner confessed to killing Reid.

Petitioner was indicted in June 1989 for first degree murder, sexual assault, and kidnapping. Due to extensive pretrial litigation concerning admissibility of DNA evidence, trial did not commence until August 1994. During this lengthy period, Petitioner was represented by three attorneys: William G. Lane, from indictment through November 1991; M. Josephine Sotelo, a DNA specialist, from May 1991 to June 1994, when the trial court barred use of DNA evidence as a discovery sanction; and Marshall Tandy, from November 1991 through sentencing. A jury convicted Petitioner on all counts in August 1994.[4] During the sentencing hearing, Petitioner apologized for killing Reid. (RT 12/21/94 at 12.) The trial judge sentenced him to death on the murder conviction.

On appeal, the Arizona Supreme Court affirmed. *State v. Spreitz*, 190 Ariz. 129, 945 P.2d 1260 (1997). On March 28, 2000, Petitioner filed a petition for post-conviction relief (PCR), which the PCR court denied without a hearing. The Arizona Supreme Court reversed the PCR court's ruling that Petitioner's ineffective assistance of counsel (IAC) claims were precluded but affirmed the court's alternative ruling that the claims lacked merit. *State v. Spreitz*, 202 Ariz. 1, 39 P.3d 525 (2002).

Petitioner then initiated the instant habeas proceedings and filed an amended petition raising numerous claims for relief.[5] (Dkt. 38.) He subsequently moved for an

---

**3.** This factual summary is based on the Court's review of the record and the Arizona Supreme Court's opinion upholding Petitioner's conviction and sentence. *State v. Spreitz*, 190 Ariz. 129, 945 P.2d 1260 (1997).

**4.** The jury unanimously convicted Petitioner under each of the alternative theories of premeditated and felony murder. (RT 8/18/94 at 758.)

**5.** The amended petition does not sequentially label all of Petitioner's claims and sub-claims. Accordingly, the Court has adopted its own identification system, endeavoring to utilize as near as possible the claim numbers set forth in the amended petition.

evidentiary hearing with respect to his IAC claims. The Court denied the motion without prejudice because Petitioner had not identified which claims required a hearing and had failed to explain what facts needed further development or how such facts would entitle him to relief. (Dkt. 56 at 4.) Petitioner filed a renewed motion for evidentiary development. (Dkt. 74.) The Court denied this motion as well, concluding that Petitioner had failed to diligently seek development of his IAC claims in state court. (Dkt. 89 at 37.) The Court also dismissed several of the claims on the merits. (*Id.* at 38.) This order addresses Petitioner's remaining habeas claims.

### *PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT*

■ A writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

■ A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Picard v. Connor,* 404 U.S. 270, 277–78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim. *See Casey v. Moore,* 386 F.3d 896, 913 (9th Cir.2004). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding,* 189 F.3d 882, 888 (9th Cir.1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert,* 319 F.3d 1153, 1158 (9th Cir.2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R.Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R.Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

■ A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n. 1, 111 S.Ct. 2546; *see also*

*Ortiz v. Stewart,* 149 F.3d 923, 931 (9th Cir.1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman,* 501 U.S. at 732, 735 n. 1, 111 S.Ct. 2546; *see also Gray v. Netherland,* 518 U.S. 152, 161–62, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996).

 Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross,* 468 U.S. 1, 9, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

 Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753, 111 S.Ct. 2546. Objective factors which constitute cause include interference by officials which makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart,* 144 F.3d 613, 617 (9th Cir.1998). To establish prejudice resulting from a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

## STANDARD FOR HABEAS RELIEF

 Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett,* 393 F.3d 943, 969 (9th Cir.2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming,* 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker,* 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)); *Insyxiengmay v. Morgan,* 403 F.3d 657, 664 (9th Cir.2005).

 "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146

L.Ed.2d 389 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams,* 529 U.S. at 365, 120 S.Ct. 1495; *see Carey v. Musladin,* 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006): *Clark v. Murphy,* 331 F.3d 1062, 1069 (9th Cir.2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams,* 529 U.S. at 381, 120 S.Ct. 1495. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark,* 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495; *see Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495; *Lambert,* 393 F.3d at 974.

■■■ Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular … case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407, 120 S.Ct. 1495. In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495; *Woodford v. Visciotti,* 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

■■ Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller–El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (*Miller–El I*); *see Taylor v. Maddox,* 366 F.3d 992, 999 (9th Cir.2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption

by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller–El II*, 545 U.S. at 240, 125 S.Ct. 2317.

## *DISCUSSION*

### I. CONVICTION–RELATED CLAIMS

At trial, the crucial evidence against Petitioner was his own taped confession, which was played to the jury. (RT 8/11/94 at 466.) In the confession, Petitioner admitted picking up Ruby Reid at a convenience store and driving her to a remote area in the desert where they began to "make out." (Dkt. 63, Ex. J at 9.) At some point, Reid told Petitioner she wanted something to drink and became upset that he did not have anything. She was angry, began yelling, and told him she did not want to have sex. (*Id.* at 12, 15.) She got out of the car; Petitioner followed and caught up with her. At some point, she fell to the ground. (*Id.* at 10, 12–13.) Petitioner then jumped on top of her, ripped off her remaining clothing, including a bloody and fecal-stained tampon, and had intercourse with her. (*Id.* at 10–11, 16.) He was angry and began to hit her repeatedly. (*Id.* at 10, 12–13.) Reid continued to yell. Petitioner then hit her in the head several times with a rock to quiet her. After she became silent he left the scene not knowing if she was dead or alive. (*Id.* at 16–17.) Several days later he rode his bicycle back to the area to see if she was still there. (*Id.* at 18.) He did not know that authorities had discovered and removed her body the day before. (*Id.*)

Alana Owens, one of Petitioner's roommates, testified that Petitioner and her boyfriend, who also lived with Petitioner, went out drinking early on the evening of May 18. When they returned at about 12:15 a.m., her boyfriend was very drunk. (RT 8/11/94 at 329–30.) However, Petitioner seemed fine and left shortly thereafter, stating that he wanted to "pick up a date." (*Id.* at 331.) Petitioner returned at about 3:00 a.m. but Owens did not see him right away as he went straight to the bathroom upstairs. (*Id.* at 332.) He came down about fifteen minutes later wearing only a towel. Petitioner asked Owens what she would do if someone in her gang killed someone. He then told her he had been in a fight with a black man, that Petitioner got the best of him, and that he did not know if the guy was still alive. (*Id.* at 333–35.) Owens later went to the bathroom and noticed Petitioner had placed wet clothes and a pair of tennis shoes in the tub. The shoes had dark stains on them. (*Id.* at 338.)

Tucson Police Officer Ramon Batista testified that he initiated a stop of Petitioner's car at approximately 1:45 a.m. the morning of the murder. (RT 8/10/94 at 223–24.) When Petitioner got out of his car, Batista noticed that his shirt was torn and he was covered in blood and feces. (*Id.* at 227.) Sergeant Victor Chacon arrived shortly thereafter and observed that Petitioner was "covered in blood" but did not appear to have any injuries. (*Id.* at 247–48.) Petitioner told Chacon about a fight with a black man. When asked why he was "covered in blood" but had no injuries, Petitioner explained that his injuries did not bleed but that the other man was badly hurt and had bled. (*Id.* at 248.) Chacon later noticed that Petitioner also had feces on his body.

Detectives Karen Wright and Joseph Godoy described the scene where the victim's body was found several days later in a desert area near some brush. Godoy testified that photographs of the scene showed "lines" in the soil evidencing a scuffle as well as "drag marks" leading from the body, indicating that it had been moved. (RT 8/11/94 at 435–42.) Wright described photographs showing tire marks and oil stains. (RT 8/12/94 at 515.) Pants,

tennis shoes, socks, a torn brassiere, and a used tampon were strewn about the site. Blood was found on soil and rocks near the body. (*Id.* at 511–15.)

Because the victim's body was badly decomposed, her blood was not positively identified. However, Steven Clemens, a criminalist who tested the blood stains in Petitioner's car and on the clothing and rocks at the crime scene, testified that stains in the trunk of the car and at the crime scene were not consistent with Petitioner's blood. (*Id.* at 555–68.) Clemens further opined that the blood found in Petitioner's trunk and rear bumper, on the soil around the crime scene, and on Reid's brassiere and tampon may have come from the same person. (*Id.* at 572.) Her brassiere had been "torn off." (*Id.* at 569.) Clemens noted that feces was found in Reid's discarded tampon. (*Id.* at 570.)

Dr. Thomas Henry, a forensic pathologist who autopsied Reid, testified that she was killed by a severe fracture of her skull. (RT 8/16/94 at 634–35.) She also sustained multiple injuries, including several bruises and lacerations to her head, arms, legs, and torso. She had several fractured ribs and a broken jaw. She also had internal injuries, most likely caused by blunt trauma. (*Id.* at 624–27.)

## Claim 1: Petitioner's Right to a Speedy Trial under the Sixth and Fourteenth Amendments Was Violated

Petitioner alleges that the delay between his arraignment in June 1989, and the commencement of his trial in August 1994, violated his federal constitutional right to a speedy trial. He contends this delay was attributable primarily to the State's desire to present DNA evidence "and cannot be counted against Petitioner." (Dkt. 38 at 30.) He argues that the delay prejudiced him in several ways, including oppressive pretrial incarceration, prolonged anxiety caused by the knowledge he faced a potential death sentence, and impairment of his defense due to compromised or unavailable witnesses. (*Id.* at 31–32.)

### Background

Petitioner was arraigned on June 12, 1989. (ROA at 26.)[6] After a series of continuances, at a pretrial conference held on August 30, 1989, the parties agreed to a trial date of February 14, 1990. Petitioner personally agreed to this postponement. (RT 8/30/89 at 4.) At a hearing on January 25, 1990, both parties asked the trial court for a continuance until April 3, 1990. The primary reason for the delay was that it would take until the end of March before DNA test results from the crime scene were analyzed. The Court agreed to a continuance provided counsel filed a written motion and a waiver from Petitioner. (RT 1/25/90 at 2–7.) Both documents were filed shortly thereafter. (ROA at 57, 59.) Additional continuances were granted with Petitioner's express consent up through a trial date of April 23, 1991. (*Id.* at 64–69, 93–95, 226–31.)

On January 2, 1991, the State moved for admission of the DNA test results.[7] (ROA at 208.) On April 17, 1991, Petitioner's

---

6. "ROA" refers to the thirteen-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal (Case No. CR–94–0454–AP). "RT" refers to the reporter's transcript. The original reporter's transcripts and certified copies of the state court records were provided to this Court by the Arizona Supreme Court. (Dkt. 64.)

7. The record does not contain a precise description of the DNA evidence. However, in its motion the State characterized the DNA tests as establishing that Ruby Reid's blood was in the interior and trunk of Petitioner's car. (ROA at 210.)

counsel filed a motion to continue the April 23 trial date. (*Id.* at 278.) At oral argument, both Petitioner's counsel and the prosecution argued that matters involving the admissibility of DNA evidence were still in flux and that additional time was needed before trial could proceed. (RT 4/23/91 at 2–8.) The Court vacated the trial date. (ROA at 281.)

On May 2, 1991, the trial court granted Petitioner's request for additional DNA experts and for the appointment of Josephine Sotelo to be lead attorney in addressing DNA issues. (ROA at 283.) On May 17, Sotelo moved to compel production of documents and data from the FBI lab involved in processing the DNA evidence. (*Id.* at 294–309.) In November and December 1991, the court held an evidentiary hearing to determine the scope of matters to be addressed at the impending *Frye* hearing. (*Id.* at 810, 1047, 1072, 1074, 1076, 1084, 1086, 1317, 1340–42.) Thereafter, Petitioner unsuccessfully challenged the trial court's ruling as to the scope of the *Frye* hearing in a special action to the Arizona Court of Appeals, followed by an unsuccessful petition for review to the Arizona Supreme Court. (*Id.* at 1587, 1602.) These challenges delayed proceedings through the end of 1992.

The trial court scheduled further matters concerning the DNA evidence into 1993. At a status conference held on February 17, 1993, Petitioner requested a hearing to determine what his counsel, Marshall Tandy, had been doing to advance his case. (ROA at 1628.) At a hearing on March 3, 1993, Tandy told the court that because the DNA hearings were ongoing and Ms. Sotelo had been especially retained to litigate those matters, "there's nothing ongoing, right now, and Mr. Spreitz has been sitting in jail for a long time." (RT 3/3/93 at 3.) At a hearing two weeks later, Petitioner withdrew his

reservations about Tandy. (RT 3/19/93 at 3, 7.)

The *Frye* hearing began in April 1993 and continued through June. (ROA at 1633–43, 1664–69, 1681–87). On December 3, 1993, the trial court issued a minute entry granting the State's request for admission of the DNA evidence. (*Id.* at 1938–46.) The court followed up with formal findings of fact and conclusions of law on January 12, 1994. (*Id.* at 1947–67.)

On February 18, 1994, the court set a trial date of June 28, 1994. (ROA at 1933.) However, additional DNA and other pretrial matters continued to be litigated into June. (*Id.* at 1983–86.) On June 3, the trial court granted Petitioner's motion to exclude the DNA evidence based on the State's failure to comply with orders to disclose to the defense the names of all lab technicians in the case. (*Id.* at 2005.)

At a hearing on June 15, 1994, Petitioner advised the court that he would be moving to dismiss the case based on a violation of his right to a speedy trial. (RT 6/15/94 at 2–3.) On June 17, 1994, Petitioner moved to continue the June 28 trial date; the court granted the continuance and reset trial for August 9, 1994. (ROA at 2141–42.) The court denied Petitioner's speedy trial motion on July 25, 1994. (*Id.* at 2158–59.) Trial commenced on August 9, 1994.

On direct appeal, the Arizona Supreme Court rejected Petitioner's speedy trial claim. The court first concluded that the delay did not warrant reversal under Arizona law, noting that after Petitioner's express waiver of time expired on April 23, 1991, he "could have asserted his rights and filed a motion to dismiss any time after thirty-three days past April 23, 1991; he elected not to do so." *Spreitz*, 190 Ariz. at 139, 945 P.2d at 1270. The court further noted that, although the period between arraignment and trial was "unprece-

dented," Petitioner and his counsel knew or should have known of his right to demand a trial within the times limits of Rule 8 of the Arizona Rules of Criminal Procedure because "the trial judge explained this right to defendant each time the court continued the trial date." *Id.*

Next, the court addressed the constitutional implications of the delay:

> Neither the United States nor the Arizona Constitution requires that a trial be held within a specified time period. In *Barker v. Wingo,* the Supreme Court established a test by which courts decide whether trial delay warrants reversal. The four-factor *Barker* analysis examines "(1) the length of the delay; (2) the reason for the delay; (3) whether the defendant has demanded a speedy trial; and (4) the prejudice to the defendant." In weighing these factors, the length of the delay is the least important, while the prejudice to defendant is the most significant. We apply each of the *Barker* factors to the facts presented here.
>
> A pretrial period after arraignment of over five years is presumptively prejudicial. This factor, however, must be considered in concert with the remaining three *Barker* factors. Not surprisingly, defendant attributes the reason for the delay primarily to the state's desire to present DNA evidence. In fact, the evidentiary hearings were required when defendant moved to exclude this evidence. We agree with the state that it would be unjust to allow defendant to force exclusion of potentially probative evidence where its admission provides a court with an issue of first impression and requires a lengthy evidentiary hearing. Where, as here, a defendant fights to exclude DNA evidence, the delay resulting from hearings necessary to determine admissibility is necessarily attributable to the defense. Obviously, we

> conclude that a defendant may contest the admissibility of scientific evidence but not that he may do so and then later contend violation of speedy trial rights due to delays occasioned by the contest. In so stating, we do not seek to penalize the defendant but merely to accommodate his wishes without jeopardizing the state's interest in bringing the matter to trial.
>
> Here, defendant waived his speedy trial rights in advance of the hearings and, for reasons the record does not reveal, never objected to the court that his rights had been compromised by the long delay. Thus, we find that the reason for the delay weighs against defendant's position. Defendant did not move to dismiss for violation of speedy trial rights until after the DNA evidentiary hearing process had run its three-year course. His assertion of rights was thus untimely and bears little weight in our *Barker* analysis. Furthermore, defendant did not complain of any violation of speedy trial rights until twelve days before trial, and the next day he moved to continue the trial because of defense counsel's scheduling conflict.
>
> Finally, defendant claims no prejudice from the trial delay other than that arising out of his long period of custody. While five years in custody may have increased defendant's anxiety quotient, we find, on the entire record, that the delay did not prejudice his ability to defend against the state's claims. After weighing each of the *Barker* factors, we conclude that defendant's constitutional right to an expeditious trial has not been unduly disturbed.

*Id.* at 139–40, 945 P.2d at 1270–71 (citations omitted).

*Analysis*

As a threshold matter, the Court rejects Respondents' assertion that the Arizona

Supreme Court's finding of waiver under Rule 8 of the Arizona Rules of Criminal Procedure constitutes an alternative ruling to its merits analysis of Petitioner's federal constitutional claim and that Claim 1 is therefore procedurally defaulted. (Dkt. 62 at 20.) It is evident from both Petitioner's appellate brief and the state supreme court's decision that Petitioner presented this claim on two separate legal fronts: as a violation of Rule 8 and as a violation of his state and federal constitutional rights. Although the state court determined that Petitioner had "waived his right to object [under Rule 8] by not objecting when the violation was occurring," this waiver finding was simply one factor in the court's analysis of Petitioner's federal constitutional claim. *Spreitz*, 190 Ariz. at 139–40, 945 P.2d at 1270–71. Therefore, this Court addresses the merits of the federal constitutional aspect of Petitioner's speedy trial claim.

As the state supreme court noted, the United States Supreme Court has directed courts to consider four factors in determining whether there has been a constitutional speedy trial violation: (1) the length of the delay and whether it was "uncommonly long"; (2) the reason for the delay, including whether the government or the defendant was responsible for it; (3) the defendant's assertion of the right; and (4) whether the defendant suffered prejudice as a result of the delay. *See Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)); *see also Reed v. Farley*, 512 U.S. 339, 353, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) ("A showing of prejudice is required to establish a violation of the Sixth Amendment Speedy Trial Clause.").

 Prejudice may consist of oppressive pretrial incarceration, the anxiety and concern of the accused, and the possibility that the defense will be impaired. *Doggett*, 505 U.S. at 654, 112 S.Ct. 2686. Of these concerns, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532, 92 S.Ct. 2182. The burden of showing prejudice lies with the individual claiming the violation, and the mere possibility of prejudice is not sufficient to support the position that speedy trial rights are violated. *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986); *see United States v. Baker*, 63 F.3d 1478, 1497 (9th Cir.1995) (no need to examine other factors where defendant fails to show prejudice from delay).

 With respect to the claim's merits, the Court concludes that Petitioner is not entitled to habeas relief. While a five-year delay between arraignment and trial is presumptively prejudicial, *see Doggett*, 505 U.S. at 652 n. 1, 112 S.Ct. 2686, when weighed against the other *Barker* factors, the delay does not warrant relief under the circumstances of this case.

 Much of the delay in this case is attributable to resolution of legitimate pretrial motions, a fact that weighs against the finding of a speedy trial violation. As the Court noted in *Doggett*, "speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable. The government may need time to collect witnesses against the accused, [or] oppose pretrial motions. . . . We attach great weight to such considerations when balancing them against the costs of going forward with a trial whose probative accuracy the passage of time has begun by degrees to throw into question." 505 U.S. at 656, 112 S.Ct. 2686; *see United States v. O'Dell*, 247 F.3d 655, 668 (6th Cir.2001) (resolution of pretrial motions justifies de-

lay); *United States v. Schlei*, 122 F.3d 944, 987 (11th Cir.1997) (delay due to resolution of pretrial motions did not trigger violation of Sixth Amendment right to a speedy trial); *United States v. Jones*, 91 F.3d 5, 8 (2d Cir.1996) ("legitimate pretrial proceedings are 'neutral reasons not attributable to the government' ").

Here, the delay arose from litigation concerning the admissibility of DNA evidence. Petitioner assigns responsibility to the State and its "desire to present the DNA evidence." (Dkt. 38 at 30.) However, the Arizona Supreme Court determined that the protracted nature of the litigation was not occasioned by the State's desire to introduce DNA evidence but, rather, by Petitioner's objection to its admission. The court noted that the evidentiary hearings and litigation related to the DNA issues stemmed from Petitioner's desire to exclude the evidence at trial and, therefore, any delay was "necessarily attributable to the defense." *Spreitz*, 190 Ariz. at 140, 945 P.2d at 1271.

Indeed, Petitioner sought and obtained from the trial court appointment of counsel who specialized in DNA evidence.[8] Counsel thereafter zealously challenged the scope and admissibility of such evidence, including, at one point, pursuing a special action to the Arizona Court of Appeals and a petition for review to the Arizona Supreme Court. Thus, this Court agrees that the primary cause of the delay was attributable to Petitioner rather than the State. As the Arizona Supreme Court noted, while Petitioner was within his rights to challenge the admissibility of the DNA evidence, he could not do so and then contend that his speedy trial rights were violated by the consequent delay.

The third *Barker* factor also weighs against Petitioner's claim. Petitioner did not assert his speedy trial rights in a timely fashion. He expressly waived these rights for the first two years following his arraignment. After that, although not expressly waiving his rights, Petitioner failed to allege any violation of his right to a speedy trial until June 1994, a full five years after his arraignment. Even then, just days later, he moved for another continuance and trial was again postponed for several months.

With regard to prejudice, Petitioner proffers several arguments. First, a paraplegic who died before trial and for whom Petitioner provided care could have provided helpful testimony at the sentencing hearing about his personal experiences with Petitioner. Second, a former girlfriend could have provided testimony at the sentencing hearing concerning his intoxication on the night of the murder. Third, the delay hindered Petitioner's ability to locate and talk to other potential witnesses, including family members, and caused his "mental abilities" to deteriorate. (Dkt. 38 at 33.) Finally, Petitioner asserts that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify" and therefore specific impairment need not be shown. (Dkt. 38 at 34 (quoting *Doggett*, 505 U.S. at 656, 112 S.Ct. 2686).)

While it is true that specific impairment is difficult to establish, the Court has cautioned that presumed prejudice from excessive delay "cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria." *Doggett*, 505 U.S. at 656, 112 S.Ct. 2686. Here, other than the delay itself, none of the other *Barker*

---

8. The reason for appointment of special counsel and the prolonged litigation appears to be due to the fact that this case was a "test case" in Pima County for the admissibility of RFLP DNA evidence. *Spreitz*, 190 Ariz. at 139, 945 P.2d at 1270.

factors supports Petitioner's claim of unconstitutional delay. In addition, Petitioner alerted the judge to his work as a nurse and caregiver to a paraplegic prior to sentencing (Dkt. 63, Ex. T at 1), and Petitioner has not supported his claim that his ex-girlfriend could have provided relevant testimony concerning his level of intoxication.[9] Thus, Petitioner's claim of impairment to his sentencing defense fails. He also has failed to substantiate his claim of diminished "mental abilities" resulting from the delay or shown that there were other witnesses or evidence that could have been presented but for the five-year delay.

■ Weighing all the *Barker* factors, the Court concludes that the Arizona Supreme Court's resolution of Petitioner's speedy trial claim was based on neither an unreasonable application of controlling Supreme Court law or an unreasonable determination of the facts. Therefore, Claim 1 is denied.

### Claim 4.1–A: Counsel Failed to Preserve Petitioner's Right to a Speedy Trial

Petitioner alleges that trial counsel rendered constitutionally ineffective assistance by failing to preserve his speedy trial rights. (Dkt. 38 at 50.) Petitioner raised this claim in his PCR petition, and the court found it both procedurally barred and merit less. (Dkt. 63, Ex. D at 3.)

*Clearly Established Federal Law*

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052. To prove deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S.

---

**9.** In his PCR petition, Petitioner asserted that his ex-girlfriend told police and a defense investigator that he called her from a bar that night sounding "really trashed" and later came to her apartment and banged on her door. (Dkt. 63, Ex. G at 31.) Petitioner contends this was powerful evidence in support of his contention that he was extremely intoxicated the night of the murder. However, Petitioner has presented nothing in the habeas record from this witness to support these assertions. Furthermore, evidence concerning Petitioner's level of intoxication that night was presented at trial by police officers and other witnesses, none of whom believed he was intoxicated. (*See* RT 8/10/94 at 233, 255–56; RT 8/11/94 at 330.)

510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation and quotation marks omitted). The Supreme Court has reiterated that "[i]n judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (quoting *Strickland*, 466 U.S. at 689, 691, 104 S.Ct. 2052). Moreover, under the AEDPA, a "doubly deferential" standard applies to this Court's review of IAC claims. *Knowles v. Mirzayance*, —— U.S. ——, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009).

A court need not address both components of the *Strickland* inquiry, or follow any particular order. If it is easier to dispose of an ineffectiveness claim based on lack of prejudice, without first evaluating counsel's performance, that course should be followed. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

*Analysis*

In denying relief on this claim, the state PCR court ruled:

The lengthy pretrial period—five years from arraignment to trial—was analyzed and discussed in detail by the Arizona Supreme Court, which rejected Petitioner's claim of speedy trial violations under Rule 8 and the Sixth Amendment theories. The Supreme Court found that Petitioner himself waived his speedy trial rights under Rule 8; furthermore, the Court noted that Petitioner did not complain about the delay until just before trial. The Court found that counsel was not deficient for failing to protest the delay, much less that counsel's performance prejudiced the Petitioner. See the discussion in *Spreitz*,

190 Ariz. at 136–40 [945 P.2d at 1267–71].

(Dkt. 63, Ex. D at 3–4 (footnote omitted).)

■ This Court agrees that counsel's failure to file a "timely" speedy trial motion did not constitute ineffective assistance of counsel. In light of Petitioner's taped confession that he killed Ruby Reid, the defense strategy was to admit to the murder but argue it was neither premeditated nor committed in furtherance of a kidnapping and/or sexual assault, thus negating the elements of first degree murder. (*See* RT 8/10/94 at 211–18; RT 8/17/94 at 693–733.)

The evidence supporting both premeditation and felony murder was circumstantial. Blood found in the trunk of Petitioner's car constituted the strongest evidence for kidnapping, one of the predicate felonies, and further supported the State's argument that Reid's sexual assault and death were planned by Petitioner and not a product of the heat of the moment. However, the blood was not positively identified. At trial, the defense argued that the evidence to support kidnapping was speculative. Although the precise nature of the DNA evidence is not revealed in the habeas record, the State, in its motion seeking admission of the evidence, characterized the evidence as establishing that the victim's blood was present in both the interior and the trunk of Petitioner's car, a characterization Petitioner does not dispute. (ROA at 210.)

Evidence confirming that the blood belonged to Reid would have solidified the kidnapping theory advanced by the State. It also would have bolstered the findings made by the state courts that the murder satisfied the requirements for the "cruelty" aggravator by reinforcing the notion that Petitioner inflicted "mental anguish or physical abuse before the victim's death" and that she consciously experienced "sig-

nificant uncertainty as to [her] fate" before she was killed. *Spreitz,* 190 Ariz. at 147, 945 P.2d at 1278. Therefore, preventing the admission of definitive evidence that the blood in Petitioner's car and trunk belonged to the victim was important in furthering Petitioner's defense that she had voluntarily accompanied him to have sex and that her death occurred in a sudden, unplanned manner.

In addition, there is no evidence that Petitioner himself objected to counsel's strategy during the nearly five years the admissibility of the DNA evidence was being litigated. As already noted, Petitioner expressly consented to continuances up to April 23, 1991, occasioning nearly two years of delay.

On March 3, 1993, Petitioner did voice concerns to the trial court about the delay and seeming inaction in his case. He felt that his counsel, Marshall Tandy, had not been working on his case during the eighteen months since his appointment. (RT 3/3/93 at 2, 5.) At a hearing, the court asked counsel to confer with Petitioner and continued the matter for two weeks. (*Id.* at 4.) At a subsequent hearing, Petitioner stated:

> Marshall and I have been talking, and he explained what had been going on, and I just—he explained if he was around, that he could—that way he could explain the DNA stuff a little bit better, to me, because Ms. Sotelo is on a higher plane, with me, and she just goes over my head, and Mr. Tandy could interpret it.

(RT 3/19/93 at 3.) Petitioner then withdrew his motion for a new lawyer, stating "I'll stay with Marshall Tandy." (*Id.* at 7.) Thus, it appears at that point that he reaffirmed counsel's strategy to waive his speedy trial rights while Ms. Sotelo contested the admissibility of the State's DNA evidence even though the case had been pending for nearly four years.

■ Finally, as discussed in addressing Claim 1, other than the fact of the delay, which was clearly lengthy, Petitioner cannot point to specific prejudice. He makes conclusory, unsupported assertions that counsel failed during this period to interview witnesses and follow up on information from mental health experts "to correct their mis-impressions as to the facts of Chris' life via a thorough investigation." (Dkt. 38 at 52.) However, he does not specify what witnesses, expert or otherwise, counsel failed to interview and what information they could have provided. Moreover, it is unclear how counsel's decision to waive Petitioner's speedy trial rights and contest the admission of DNA evidence impacted these alleged deficiencies.[10]

The Court concludes that it was not an unreasonable strategy for defense counsel to vigorously challenge and oppose admission of the DNA evidence. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (to satisfy the deficient performance prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"). This is particularly so given that the case was a "test" case for determining the use of such evidence in Arizona. Pursuing this strategy necessitated delaying trial until the issue was

---

10. To the extent Petitioner reiterates claims that counsel was ineffective in failing to develop mitigation witnesses to "humanize" him, or to investigate and present evidence concerning his head injuries, childhood abuse, and level of intoxication, those allegations were presented in Claims 4.2–B, 4.2–C, 4.2–D, and 4.2–E of the amended habeas petition and denied by the Court in its order denying Petitioner's renewed motion for an evidentiary hearing. (Dkt. 89.)

resolved. Unfortunately, it took more than five years to do so. Even so, counsel's strategy ultimately led to the exclusion of the DNA evidence at trial. For all of these reasons, the PCR court's denial of this claim was neither contrary to nor an unreasonable application of *Strickland.* Claim 4.1–A is denied.

### Claim 2: Petitioner's Right to Due Process of Law was Violated by the Admission of Gruesome Photographs

Prior to the medical examiner's testimony, the prosecution sought to introduce several photographs taken during the autopsy that depicted Reid's badly decomposed body, including pictures of her upper torso and head. (RT 8/16/94 at 586–92.) The prosecutor conceded that the photographs were gruesome but argued they depicted multiple bruising on the body which, while not illustrative of how the victim died, provided circumstantial evidence of forcible sexual assault and thus contradicted Petitioner's claims of consensual sex. (*Id.* at 592.) The trial court found the photographs "shocking" but concluded they were relevant and should be admitted. (*Id.* at 593.)

On appeal, the Arizona Supreme Court disagreed. Applying Rule 403 of the Arizona Rules of Evidence, the court found that the trial court had erred in admitting the autopsy photos because the danger of unfair prejudicial effect on the jury outweighed the exhibits' probative value. *Spreitz,* 190 Ariz. at 141–42, 945 P.2d at 1272–73. However, the court determined that the error did not violate Petitioner's right to a fair trial under the federal constitution:

> While it is impossible to assess the precise effect viewing the most gruesome autopsy photographs might have had on the jury, we have no difficulty concluding beyond a reasonable doubt by reason of the overwhelming evidence against the defendant, including, most importantly, his own uncoerced confession, that the jury would have found him guilty without the photographs. We thus find the trial court's discretionary error in admitting the autopsy photographs harmless.

*Id.* at 142, 945 P.2d at 1273.

Petitioner argues that the admission of the autopsy photos inflamed the jury's passions and violated his Fourteenth Amendment right to a fair trial. (Dkt. 38 at 35.) Petitioner has not proffered copies of the relevant exhibits but, according to the Arizona Supreme Court, the photographs

> depict the corpse as it appeared after decomposing in the desert for over three days in temperatures exceeding 100 °F. The corpse is severely discolored, and in all of the photographs insects are shown partly covering the body. This insect activity is vividly apparent in the close-ups. Perhaps the most disturbing photograph, marked Exhibit 156, depicts the victim's face staring at the camera in a mummy-like mask of death.

*Spreitz,* 190 Ariz. at 140, 945 P.2d at 1271.

The admission of photographs is a state law matter that "lies largely within the discretion of the trial court," *Batchelor v. Cupp,* 693 F.2d 859, 865 (9th Cir.1982), and only if the admission of the evidence was so prejudicial as to offend due process may the federal courts consider it on habeas review. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also Gerlaugh v. Stewart,* 129 F.3d 1027, 1032 (9th Cir.1997) (finding claim not cognizable where admission of gruesome photographs did not implicate fundamental unfairness). Even if photographs are improperly admitted, such error will be deemed harmless unless the petitioner can establish that

their admission had a substantial and injurious effect on the jury's verdict. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

While Petitioner cites no case in which habeas relief was granted based on the admission of gruesome photographs, courts have consistently held that admission of photographs that are "at least arguably relevant and probative" does not violate due process. *Kuntzelman v. Black,* 774 F.2d 291, 292 (8th Cir.1985); *see Villafuerte v. Lewis,* 75 F.3d 1330, 1343 (9th Cir.1996) (photos relevant to prove that defendant knowingly restrained the victim); *Thornburg v. Mullin,* 422 F.3d 1113, 1129 (10th Cir.2005) (no due process violation where petitioner challenged the admission of six photographs "depicting the charred remains of the victims' bodies"; despite the fact that the petitioner did not dispute the manner of death, "the state still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts, provided an accurate account of events"); *Biros v. Bagley,* 422 F.3d 379, 391 (6th Cir.2005) (gruesome photos were probative of state's theory that petitioner meticulously dissected victim and did not act in a blind rage); *Willingham v. Mullin,* 296 F.3d 917, 928–29 (10th Cir.2002) (denying claim that the admission of 22 photos of the murder victim's body was so unduly prejudicial as to render his trial fundamentally unfair, where photos relevant to issue of intent).

■ As the Arizona Supreme Court stated, there is little question that the contested photos were relevant to show the fact and cause of Reid's death. *Spreitz,* 190 Ariz. at 142, 945 P.2d at 1273. Although the state supreme court also determined that the gruesome character of the photos outweighed their minimal probative value, this does not necessarily establish a due process violation. Moreover,

the admission of the photographs was harmless in light of the overwhelming evidence of guilt presented at trial. This included, most notably, Petitioner's detailed confession, as well as an array of physical evidence circumstantially tying Petitioner to the crime scene.

■ Under these circumstances, the Court finds that the admission of the autopsy photographs did not have a substantial and injurious effect on the jury's verdict. *See Futch v. Dugger,* 874 F.2d 1483, 1487–88 (11th Cir.1989) ("[B]ecause there was overwhelming evidence of guilt, the photograph [showing nude victim's gunshot wounds] was not a 'crucial, critical, highly significant factor' in petitioner's conviction."). The Arizona Supreme Court's conclusion that the admission of the autopsy photographs was constitutionally harmless was neither contrary to nor an unreasonable application of clearly established federal law. Claim 2 is denied.

**Claim 3: The Court's Instructions to the Jury Violated Petitioner's Right to a Fair Trial**

**Claim 4.1–G: Trial Counsel was Ineffective in Failing to Request Certain Jury Instructions or to Object to Certain Others**

**Claim 4.3–A: Appellate Counsel was Ineffective in Failing to Request Certain Jury Instructions or to Object to Certain Others**

In Claim 3, Petitioner presents three separate claims. He alleges that his constitutional rights were violated by the trial court's instructions on premeditation and felony murder and by the court's failure to instruct the jury that it did not have to return a verdict if it was unable to do so. (Dkt. 38 at 38–45.) In Claim 4.1–G, Petitioner asserts ineffective assistance of trial

counsel for failing to object to the court's premeditation and felony murder instructions and to request an instruction that the jury did not have to return a verdict. (*Id.* at 68–70.) In Claim 4.3–A, Petitioner complains that appellate counsel likewise performed deficiently for failing to raise these jury instruction issues on direct appeal. (*Id.* at 98.)

*Procedural Status*

■ The substantive instructional errors raised as Claim 3 were never presented on direct appeal. Instead, Petitioner presented them in his PCR petition. (Dkt. 63, Ex. G at 54–58.) Although the PCR court alternatively discussed the merits of Petitioner's claims, denying them in summary fashion, the court first found the claims precluded under Rule 32.2(a)(3) of the Arizona Rules of Criminal Procedure because they could have been raised on direct appeal. (Dkt. 63, Ex. D at 15–16.) Thus, the state court "explicitly invoke[d] a state procedural bar as a separate basis for decision." [11] *Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). This preclusion ruling rests on an independent and adequate state procedural bar. *See Stewart v. Smith,* 536 U.S. 856, 860, 122 S.Ct. 2578, 153 L.Ed.2d 762 (2002) (per curiam) (Rule 32.2(a) is independent of federal law); *Ortiz,* 149 F.3d at 931–32 (Rule 32.2(a) is regularly and consistently applied). Therefore, Claim 3 is procedurally barred, absent a showing of cause and prejudice or a fundamental miscarriage of justice.

Petitioner has not asserted cause for his failure to properly exhaust Claim 3; nor has he attempted to demonstrate that a fundamental miscarriage of justice will occur if Claim 3 is not addressed on the merits. Although Petitioner does not expressly assert trial or appellate IAC as cause, such allegations were themselves properly exhausted during his PCR proceedings and, if meritorious, could potentially serve as cause to overcome the default of Claim 3. Accordingly, the Court turns to the merits of these IAC allegations.

*Premeditation Instruction*

■ The trial court gave the following jury instruction:

"Premeditation" means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation it if is the instant effect of a sudden quarrel or heat of passion.

(RT 8/17/94 at 670–71.) Defense counsel did not object to this instruction, and appellate counsel did not raise on appeal any issues concerning it. In finding that neither trial nor appellate counsel's representation was deficient in this regard, the PCR court ruled that there was no error in giving the instruction. (Dkt. 63, Ex. D at 7–8, 13, 15.)

Petitioner acknowledges that the court's instruction accurately reflected the statutory definition in effect at the time of his trial [12] but argues that the instruction vio-

**11.** On petition for review of the PCR court's ruling, the Arizona Supreme Court agreed to consider only whether the trial court properly determined that Petitioner's claims of ineffective assistance of counsel were precluded because they had not been raised on direct appeal. The court summarily denied review on all other claims without comment. Thus, with respect to Claim 3, the PCR court's ruling is the last reasoned determination by a state court.

**12.** Pursuant to A.R.S. § 13–1105(A)(1), "A person commits first-degree murder if: Intending or knowing that the person's conduct will cause death, the person causes the death of another person ... with premeditation."

lated his federal constitutional rights because it relieved the state of its burden of proving the element of actual reflection necessary for first degree murder. (Dkt. 38 at 38–39.) Therefore, Petitioner contends, counsel were deficient for not alerting the trial and appellate courts to this issue. The Court disagrees.

The trial court's premeditation instruction did not render Petitioner's trial fundamentally unfair. The instruction does not, on its face, permit a finding of premeditation based solely on the passage of time, but specifically states that first degree murder requires "intention" that the defendant will kill under a circumstance which "permits reflection." *See State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d 420, 428 (2003) (holding that the statutory definition of premeditation requires actual reflection and not the mere passage of time). Thus, the instruction explicitly distinguishes intent as existing before, and as something distinct from, reflection. The instruction clarifies that impulsive acts do not satisfy the premeditation requirement by excluding acts committed as "the instant effect of a sudden quarrel or heat of passion." Finally, nothing in the prosecutor's argument or the remainder of the court's instructions inaccurately suggested that the State needed only to prove the time element of reflection in lieu of actual premeditation.

■■ Secondarily, Petitioner was unanimously convicted of both premeditated and felony murder, and premeditation is not an element of felony murder. As a result, any error regarding the premeditation instruction did not so infect the trial with error that it rendered Petitioner's first degree murder conviction a denial of due process. Therefore, neither trial nor appellate counsel were ineffective for failing to alert the trial and appellate courts to Petitioner's federal constitutional concerns regarding the premeditation jury instruction.

*Felony Murder Instruction*

■■ The trial court gave the following instructions concerning felony murder:

There are two separate definitions of first degree murder. . . .

. . . .

The second is when such a person commits or attempts to commit sexual assault or kidnapping and in the course of, and in the furtherance of such offense, or immediate flight from such offense, such person causes the death of any person. This type of first degree murder requires no specific mental state other than that which is required for the commission of sexual assault or kidnapping.

. . . .

With respect to the felony murder rule, insofar as it provides the basis for a charge of first degree murder, it is the law that there is no requirement that the killing occurred "while committing" or "engaged in" the felony, or that the killing be a part of the felony. The homicide need not have been committed to perpetrate the felony.

It is enough if the felony and the killing were part of the same series of events.

(RT 8/17/94 at 670–71, 673.) Defense counsel did not object to this instruction, and appellate counsel did not raise on appeal any issues concerning it. In finding

---

A defendant kills with premeditation if he "acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." A.R.S. § 13–1101(1).

that neither trial nor appellate counsel's representation was deficient in this regard, the PCR court ruled that there was no error in giving the instruction. (Dkt. 63, Ex. D at 7–8, 13, 15.)

Citing Arizona law, Petitioner contends this instruction was flawed:

> While the court correctly instructed the jury that the state was required to prove that the death was "in the course of" and "in furtherance of" the crimes of sexual assault or kidnapping, the complained of instruction relieved the state of proving both elements of felony murder by stating that there is no requirement that the killing occurred "while engaged in the felony" (eliminating the "in the course of" requirement) and by stating that "it is enough if the felony and the killing were part of the same series of events." (eliminating the requirements that the killing occur "in the course of" a sexual assault or kidnapping and be "in furtherance of" such crime(s) or immediate flight therefrom).

(Dkt. 38 at 41–42) (citations omitted). Therefore, Petitioner contends, counsel were deficient for not alerting the trial and appellate courts to this issue. The Court disagrees.

In determining that the felony murder instruction was proper, the PCR court cited *State v. Miles*, 186 Ariz. 10, 918 P.2d 1028 (1996). (Dkt. 63, Ex. D at 15.) In *Miles*, the Arizona Supreme Court upheld a felony murder instruction virtually identical to the one used here, although, as Petitioner notes, the court did discourage the use of the phrase *"[i]t is enough if the felony and the killing were part of the same series of events."* 186 Ariz. at 15, 918 P.2d at 1033.

■ Petitioner argues that the *Miles* court erred in upholding this instruction. However, it is not for this Court to reexamine the correctness of state court rul-

ings on state law matters. *See Estelle*, 502 U.S. at 67–68, 112 S.Ct. 475. Petitioner concedes that *Miles* upheld the instruction to which he now objects. Therefore, he cannot show that trial and appellate counsel were ineffective for not challenging the court's instruction on felony murder.

### Lack of Instruction on Returning Verdict

Petitioner alleges that his rights were violated because the trial court failed to instruct the jurors that they need not return a verdict if they are unable to do so. The PCR court rejected this claim in summary fashion, stating simply that there is "absolutely" no such requirement and citing in support *State v. Thomas*, 133 Ariz. 533, 652 P.2d 1380 (1982), which held that a trial court's failure to instruct the jury that it was not required to return a verdict is not error. (Dkt. 63, Ex. D at 15–16.)

In support of this claim, Petitioner cites language in the instructions informing the jury that to reach a verdict "[a]ll twelve jurors must agree on a verdict." (RT 8/17/94 at 750.) The Court disagrees that this was tantamount to telling the jury it had to reach a verdict. Rather, it merely informed the jurors that in order to reach a verdict they must agree unanimously. Petitioner has failed to show that trial and appellate counsel were ineffective for failing to challenge this instruction.

### Conclusion

■ Because the court's instructions were not erroneous and Petitioner was not entitled to an instruction that the jury need not return a verdict, he has failed to establish prejudice from either trial or appellate counsel's inactions with regard to the jury instructions. *See Gonzalez v. Knowles*, 515 F.3d 1006, 1017 (9th Cir. 2008) (counsel cannot be deemed ineffective for failing to raise claims which have

no merit); *Wildman v. Johnson,* 261 F.3d 832, 840 (9th Cir.2001) (appellate counsel may not be held ineffective for failing to raise claims that have no merit). Therefore, Petitioner has failed to establish cause and prejudice for the default of Claim 3. Furthermore, because the PCR court's denial of Petitioner's IAC claims was not based on an unreasonable application of law or determination of fact, Petitioner is not entitled to habeas relief on Claims 4.1–G or 4.3–A.

### Claim 4.1–C: Counsel Never Objected to Irrelevant and Highly Prejudicial Testimony Regarding Homosexuals

■ As recounted above, Sgt. Chacon encountered Petitioner during a traffic stop shortly after the murder. (RT 8/10/94 at 244.) Chacon was struck by the fact Petitioner was covered in blood and fecal matter and asked him what happened. Petitioner told him that he was involved in a fight at a nearby convenience store. (*Id.* at 248.) Chacon noticed that although Petitioner was covered in blood he had no injuries. Petitioner explained that the blood was from his opponent. (*Id.*)

Chacon then drove to the area of the purported fight. (RT 8/10/94 at 249.) He saw no signs of an altercation and returned to the scene of the traffic stop. (*Id.* at 250.) He spoke again with Petitioner, questioning him about the fecal matter. (*Id.*) Chacon then asked Petitioner if he was gay, to which Petitioner replied "a little bit." (*Id.* at 251.) When the prosecutor questioned Chacon as to why he had asked Petitioner if he was gay, Chacon explained: "Well, there is a sex act that, I guess, homosexuals involve in where they insert their hand or an arm into their partners rectum and there is some trans-

ference of fecal matter sometimes or most of the time." (*Id.* at 251–52.)

Petitioner contends that trial counsel was ineffective for failing to object "to this unbelievably prejudicial and totally irrelevant evidence" and that this line of questioning served only to disgust jurors and prejudice them against him. (Dkt. 38 at 58.) The PCR court denied relief on this claim, determining that the testimony, even if improper, was harmless in light of the overwhelming evidence of Petitioner's guilt. (Dkt. 63, Ex. D at 5–6.)

Even assuming counsel was ineffective for failing to object to this line of questioning, the Court agrees that Petitioner cannot establish prejudice from Sgt. Chacon's testimony. As previously recounted, the evidence of Petitioner's guilt, consisting chiefly of his confession and corroborating physical evidence, was overwhelming. His confession demonstrated to the jury that the story he told officers about a fight with a black man was a contrivance. Petitioner cannot show a reasonable probability that, if counsel had objected to this aspect of Sgt. Chacon's testimony, he would not have been convicted. The PCR court's denial of this claim was neither contrary to nor an unreasonable application of *Strickland,* and Claim 4.1–C is denied.

### Claim 4.1–D: Counsel Never Had a Theory of the Defense and Failed to Present Any Witnesses or Give Petitioner the Opportunity to Participate in that Decision

■ Petitioner alleges that counsel failed to develop a defense theory. According to Petitioner, defense counsel, after conceding guilt in his opening statement, only "lamely" suggested "a lesser degree of homicide than first degree murder" and ignored the "obvious" defense of temporary insanity. Petitioner asserts

that this amounts to ineffective assistance of counsel.[13] (Dkt. 38 at 60–61.)

The defense rested without calling any witnesses. In his closing argument, counsel did not contest that Petitioner had killed Reid; rather, he argued that there was no evidence establishing that Reid went with Petitioner unwillingly, that any sexual relations between them were forced, or that the killing was premeditated. (RT 8/17/94 at 697–708, 720–32.) Counsel argued that, at most, the evidence established second degree murder or manslaughter. (*Id.* at 697, 732.)

In denying relief on this IAC claim, the PCR court stated:

> Trial counsel obviously understood and accepted the fact that the evidence overwhelmingly demonstrated Petitioner's responsibility for the victim's death. The most sound and realistic strategy, in terms of defending Petitioner at his trial, was to simply admit Petitioner's responsibility for the victim's death but to make every effort to negate any premeditation (and thus probably preclude a conviction on first degree murder).

(Dkt. 63, Ex. D at 6.)

The Court disagrees with Petitioner's claim that counsel never developed a defense theory. As noted by the PCR court, counsel's strategy was to admit responsibility for killing the victim but to argue that it was not premeditated or done in connection with a kidnapping or sexual assault and thus was not first degree murder.

Moreover, other than asserting that counsel should have done more to develop a defense, Petitioner fails to explain what counsel should or could have done to present a different, viable defense to the murder. He argues that counsel never consulted with him properly about witnesses or about whether he would testify at trial. However, as noted by the PCR court, nothing in the record indicates Petitioner wanted to testify but was dissuaded from doing so; nor has Petitioner explained what witnesses counsel should have presented at trial but did not, or how these witnesses would have helped the case.

In light of these circumstances, and given Petitioner's detailed confession to the crime, Petitioner cannot show that defense counsel's strategy was irrational or prejudicial. *See United States v. Thomas,* 417 F.3d 1053, 1059 (9th Cir.2005) (no showing of prejudice based on counsel's strategy of conceding guilt on charge supported by overwhelming evidence in an attempt to maintain credibility and avoid conviction on more serious charge) (citing *Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004)); *see also Parker v. Head,* 244 F.3d 831, 840 (11th Cir.2001) (counsel's strategic decision to concede defendant's guilt did not amount to ineffective assistance in light of overwhelming evidence of guilt, including defendant's admissible confession); *Trice v. Ward,* 196 F.3d 1151, 1162 (10th Cir.1999) (given overwhelming evidence of guilt "it was an entirely reasonable strategy for [defendant's] trial counsel to concede [that defendant raped the victim] and focus his efforts on persuading the jury that [the defendant] did not have the intent to commit first-degree murder, and/or persuading the jury to spare [his] life").

Petitioner cannot establish ineffective assistance of counsel. The PCR court's denial of this claim was neither contrary to nor an unreasonable application of *Strickland,* and the claim is denied.

---

**13.** Petitioner raised a separate claim alleging that trial counsel was ineffective for failing to pursue a temporary insanity defense. (Dkt. 38 at 54–57.) The Court previously addressed this claim in detail and concluded that it was without merit. (Dkt. 89 at 15–19.)

### Claim 4.1–F: Counsel Failed to Aggressively Pursue a Plea Bargain

 Petitioner asserts that counsel rendered ineffective assistance because he never pursued a plea bargain. He argues that if this case had not been delayed to litigate the question of the admissibility of DNA evidence, the state would have offered him a plea bargain. (Dkt. 38 at 67.) The PCR court denied relief on this claim, stating:

> There is no evidence whatsoever that the State would have, at any time, offered him a plea bargain. Thus, Petitioner's claim that the State would have offered the Petitioner a plea bargain is pure speculation and does not give rise to any colorable claim. Furthermore, a defendant in a criminal case has no constitutional right to a plea agreement.

(Dkt. 63, Ex. D at 7 (citations omitted).)

The Court has already noted that counsel pursued a reasonable strategy in challenging the admissibility of the DNA evidence. In addition, Petitioner has presented no evidence that the State was willing to make a plea bargain or made a plea offer that counsel rejected without seeking Petitioner's input. The assertion that the State would have offered a plea deal if the case had not been delayed to litigate the DNA evidence is pure speculation. *See Burger v. Kemp,* 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (IAC not established where "[the notion that the prosecutor would have been receptive to a plea bargain is completely unsupported in the record]"); *Eisemann v. Herbert,* 401 F.3d 102, 109–10 (2d Cir.2005). The decision of the state court denying this claim was neither contrary to nor an unreasonable application of *Strickland,* and Claim 4.1–F is denied.

## II. SENTENCING–RELATED CLAIMS

Following conviction and in preparation for sentencing by the trial judge, the defense enlisted the services of Dr. Todd Flynn, a forensic psychologist. Dr. Flynn met with Petitioner, interviewed family members, reviewed numerous documents, and concluded that Petitioner likely experienced an uncontrollable outburst of aggression at the time of the offense. (Dkt. 63, Ex. M at 9.) He further opined that Petitioner's young age at the time of the crime (twenty-two), combined with his social and emotional immaturity, should be weighed in mitigation, along with the absence of any prior violent behavior, the absence of Antisocial Personality Disorder, the failure of Petitioner's parents to provide treatment for alcohol abuse (which contributed to years of intoxication and the resulting conduct), and an "emotionally deprived, physically punitive home environment." (*Id.* at 10–11.) In Dr. Flynn's view, these factors distinguished Petitioner from a "habitually violent, conscienceless victimizer of others." (*Id.* at 12.)

Petitioner was also interviewed by a probation officer, who prepared a presentence report (PSR) for the trial court. Petitioner reported that on the night of the offense he and his roommate had been drinking heavily at a bar selling five-cent beers. (PSR at 3.) He lost count and did not know how many were consumed. (*Id.*) He returned home, called his girlfriend Lucy Eremic several times, then left to go to her place. (*Id.*) On the way, he stopped for more beer and encountered a stranger to whom he gave a ride and shared a "couple quick lines" of cocaine. (*Id.*) When he got to Eremic's home, she did not answer the door. (*Id.*) Petitioner left, drove down the road, and spotted Reid sitting on a curb. (*Id.*) They talked and agreed to go drinking together, and ended up in the desert

where they engaged in "heavy petting." (*Id.* at 3–4.) Petitioner told the probation officer he could not remember the exact sequence of events but recalled that the victim had started yelling at him so he hit her. (*Id.* at 4.) He claimed things were "foggy" when he was pulled over by police but now realized that "a lady died, that really sucks. It was senseless that she died." (*Id.*)

Attached to the PSR were numerous letters written on Petitioner's behalf. Petitioner's mother described him as sensitive, helpful, caring, and protective of his younger sisters. She urged the court to consider the significant role alcohol and drugs played in the offense. Petitioner's step-uncle and aunt described Petitioner's home life and offered their opinion that he was a sensitive person who was neglected as a child and not given any guidance or emotional support from either his domineering mother or his stepfather. Petitioner's sister wrote that she and Petitioner were belittled daily by their mother, who verbally abused them and played mind games. She also described physical abuse, stating that their mother would hit Petitioner with whatever she could get her hands on. Lucy Eremic relayed that, although she and Petitioner had only a brief relationship, he was a good person who treated her with respect and compassion. A jail chaplain wrote that, during Petitioner's five-year stay at the Pima County Adult Detention Center, he attended religious services, was receptive to one-on-one counseling, and got along well with others. A jail educator reported that Petitioner earned a GED while in jail pending trial and that he was pleasant, cooperative, and helpful in class.

Petitioner also wrote a letter to the trial judge. He expressed remorse for the victim's senseless death, acknowledged his alcoholism, and said he had learned much about himself during pretrial incarceration.

Prior to the aggravation/mitigation hearing, defense counsel filed a sentencing memorandum outlining the mitigating factors he believed the court should consider. The memorandum pointed to Dr. Flynn's report as persuasive evidence concerning Petitioner's state of mind during the offense. (Dkt. 63, Ex. L at 2.) The memorandum also argued that sufficient evidence established numerous other mitigating factors related to Petitioner's upbringing, including a disruptive middle childhood, a punitive and abusive childhood, an emotionally cold mother, poor social adjustment with peers, the absence of a healthy male role model, drug and alcohol abuse, abandonment by his mother as a teenager, and a persistent pattern of rejection. (*Id.* at 2–3.) In addition, the memorandum asserted as mitigation Petitioner's remorse, "newfound set of beliefs and values," cooperation with jail authorities during the lengthy pretrial period, lack of a criminal record, young age and relative immaturity, lack of education, impairment due to alcohol and dysfunctional upbringing, lack of dangerousness and propensity for violence, and good character. (*Id.* at 6, 9–12.)

At the aggravation/mitigation hearing, counsel presented three witnesses: Dr. Flynn and two corrections officers. (RT 11/28/94.) Dr. Flynn testified primarily about the findings in his report. (*Id.* at 6–52.) The corrections officers testified to Petitioner's passive nature and the fact that he lacked major disciplinary write-ups during his five years of incarceration pending trial. (*Id.* at 54, 58–59.) The State presented no evidence, relying on the evidence submitted at trial to establish that the murder was committed in an especially cruel manner under A.R.S. § 13–703(F)(6).

At the sentencing hearing several weeks later, defense counsel argued against the (F)(6) factor and urged the court to consider the cumulative effect of the mitigation evidence. (RT 12/21/94.) In particular, counsel highlighted the letters from Petitioner's sister and mother to emphasize Petitioner's dysfunctional upbringing. (*Id.* at 8–9.) Petitioner also spoke, apologizing to the victim's family for causing her death, stating that his background was not an excuse for committing murder, and asking for the opportunity to improve himself in prison. (*Id.* at 12.)

Following a recess to consider the arguments of counsel, the trial court determined that the mitigation presented did not outweigh the aggravation and sentenced Petitioner to death. (*Id.* at 36.) In aggravation, the court determined that:

> the victim was picked up at some point in the city, ... put in the trunk and she may have been even beaten at that point. There is blood on the lid of the trunk which would suggest that maybe she was sitting up or trying to get up and the trunk lid was slammed on her.
>
> I find that at the scene she was taken out of the trunk, she was thoroughly beaten, in fact five ribs were broken. There were numerous bruises and grab marks, I think in the autopsy it showed that there were eighteen that could be found.
>
> There was internal bleeding, there was internal bruising, there was a broken jaw. In addition to the death causing wounds to the head.
>
> She was sexually assaulted, it is obvious that the victim in this case was terror stricken, having been put in a trunk, carted across town into the desert, in areas several miles from the probable pickup point.
>
> And there was feces on her pants, the defendant was covered with feces, the defendant was covered with blood. I am satisfied beyond a reasonable doubt there are those elements of cruelty.
>
> I think another thing that is important in this also, the victim was a relatively small person, approximately five feet or less in height, and very slender, while the defendant is a man six feet tall, in the neighborhood of 200 pounds.

(*Id.* at 32.)

In mitigation, the court quoted from Dr. Flynn's report and found that Petitioner had established that he "suffered a disruptive childhood with a punitive cold mother, poor social judgment, drinking from the age of ten on, a mother that he could not please no matter what he did." (*Id.* at 33.) The court further noted that Petitioner's "life turned to substance abuse, alcohol and there is some suggestion that he was using cocaine or other drugs." (*Id.*) However, the court determined, based primarily on testimony from the police officers who had stopped Petitioner shortly after the crime, that neither intoxication nor substance abuse had impaired Petitioner's capacity to appreciate the wrongfulness of his conduct to any significant degree. (*Id.* at 34.) The court acknowledged Petitioner's emotional growth while in jail as well as his relative immaturity at the time of the offense, but concluded neither were significant factors. The court also found as mitigating Petitioner's lack of criminal record, lack of violent propensity, and prospects for rehabilitation. (*Id.* at 35.) However, the court disagreed that Petitioner did not pose a threat of future violence and concluded that the "situational stress built up including rejection by his mother and his girlfriend and again that night coupled with poorly developed coping skills and alcohol" was not sufficient to "mitigate the act." (*Id.*)

On direct appeal, the Arizona Supreme Court conducted an independent review of

the aggravating and mitigating evidence. *Spreitz,* 190 Ariz. at 147–50, 945 P.2d at 1278–81. The court rejected Petitioner's argument that cruelty had not been established, finding that Petitioner had "beat[en] and raped the victim in a brutal assault that lasted many minutes before he crushed her skull." *Id.* at 148, 945 P.2d at 1279. The court also reweighed the proven aggravating and mitigating factors and found that death was the appropriate sentence. *Id.* at 151, 945 P.2d at 1282. In doing so, the court agreed with the trial court's mitigation findings and concluded that none of the mitigation was especially weighty. Although not expressly addressed by the trial court, the supreme court also considered remorse in its independent reweighing, but concluded it was not compelling in light of Petitioner's failure to notify authorities of his actions when he had the opportunity to do so. *Id.* at 150, 945 P.2d at 1281.

### Claim 5: The Trial Court Erred in Applying the "Especially Cruel" Aggravating Factor

Petitioner contends that the aggravating circumstance set forth in A.R.S. § 13–703(F)(6) is applied inconsistently, is overbroad, and "fails to genuinely narrow the class of persons subject to the death penalty, and as such violates the Eighth and Fourteenth Amendments to the United States Constitution." (Dkt. 38 at 99–103, 105.)

Respondents assert that this claim is different from the claim presented on appeal, wherein Petitioner challenged the trial court's specific factual findings in determining that the (F)(6) factor had been proven. (Dkt. 62 at 60–61.) The Court disagrees. Although Petitioner did challenge the trial court's factual findings, he also raised a claim challenging the constitutional sufficiency of the "especially hei-

nous, cruel or depraved" aggravator, arguing that it was unconstitutionally vague and failed to narrow the class of homicides eligible for the death penalty. (Dkt. 63, Ex. C at 61–64, 71.) Citing *State v. Gulbrandson,* 184 Ariz. 46, 72, 906 P.2d 579, 605 (1995), which in turn cited *Walton v. Arizona,* 497 U.S. 639, 655, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Arizona Supreme Court denied relief. *Spreitz,* 190 Ariz. at 151, 945 P.2d at 1282.

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of controlling Supreme Court law. Although the United States Supreme Court has found Arizona's (F)(6) aggravating factor to be facially vague, it has also held that Arizona courts have sufficiently narrowed their application of the circumstance so as to constitutionally channel the sentencing court's discretion. *Walton,* 497 U.S. at 654, 110 S.Ct. 3047; *see also Lewis v. Jeffers,* 497 U.S. 764, 777–81, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Woratzeck v. Stewart,* 97 F.3d 329, 335 (9th Cir.1996). Moreover, the Ninth Circuit has explicitly rejected the argument that Arizona's death penalty statute is unconstitutional because "it does not properly narrow the class of death penalty recipients." *Smith v. Stewart,* 140 F.3d 1263, 1272 (9th Cir.1998).

### Claim 4.2–A: Sentencing Counsel Never Understood or Researched the State's Theory of Aggravation

Petitioner asserts that counsel rendered ineffective assistance at sentencing because he "demonstrated that he did not understand the legal distinction between cruelty and heinous and depraved, the other F6 factor." (Dkt. 38 at 71.) He contends that counsel relied on a case,

*State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983), which was not pertinent to the cruelty prong of the (F)(6) factor and failed to adequately contest the State's theory that Petitioner kidnapped the victim prior to killing her. (Dkt. 38 at 71–72.)

The PCR court rejected this claim:

The record clearly demonstrates that trial counsel (Marshall Tandy) completely understood that the sole aggravating factor relied upon by the State in seeking the death penalty was, to use counsel's own words, "the notion of cruelty." The record also demonstrates that trial counsel recognized that the element of cruelty addresses the infliction of pain on the victim, whether it is physical or mental. In any event, the Supreme Court conducted its own independent review of the aggravating and mitigating factors in this matter, and having done so, the Supreme Court determined that the aggravating circumstance of especial cruelty in Petitioner's murder of Ruby Reid outweighed all factors mitigating in favor of leniency. Thus, even if trial counsel did not completely understand the aspect of cruelty as an aggravating factor, or if he did not adequately research it, Petitioner suffered no prejudice since the facts themselves warrant a finding that the murder was committed in an especially cruel manner.

(Dkt. 63, Ex. D at 8 (citations omitted).)

The essence of Petitioner's claim is that counsel's efforts to refute the State's allegation of cruelty were deficient. He notes that counsel failed to argue that the criminalist could not identify the blood in the trunk as belonging to the victim and argues that counsel conflated arguments concerning cruelty with criteria for heinousness and depravity, which were not alleged. He also contends that counsel failed to argue the fact that the victim was killed with a rock found at the crime scene, thus negating premeditation. (Dkt. 38 at 72–73.)

Even assuming counsel was deficient in failing to make these specific arguments, Petitioner cannot establish prejudice. The Arizona Supreme Court separately weighed the evidence on appeal and concluded that it supported a finding that the murder was cruel beyond a reasonable doubt. In reaching this conclusion, the court explained:

To avoid a finding of physical pain and mental anguish, defendant suggests a scenario under which the victim was rendered unconscious before suffering any of her other injuries, including broken ribs, a broken jaw, and internal injuries.... Defendant's confession and physical evidence at the scene fully discredit his version of the events. We agree with the state that it strains reason to suppose that defendant, using two rocks, first knocked the victim senseless with fatal blows to the head, after which her unconscious body was stripped naked, beaten thoroughly, raped, and dragged to its final resting place. Under this scenario, defendant must have carried the bloody rocks along and placed them next to the victim's body. Ironically, if this court were to accept defendant's "equally plausible" hypothesis, it would almost certainly then find the (F)(6) aggravating factor of depravity. Moreover, defendant ignores his own admission that he beat her *as she fought back* and hit her with the rock *when she would not stop yelling.* This is clear evidence of conscious suffering.

*Spreitz,* 190 Ariz. at 147–48, 945 P.2d at 1278–79.

As noted by both the sentencing judge and the state supreme court, powerful evidence supported a finding of cruelty. Leaving aside the question of whether Reid willingly accompanied Petitioner or instead was forced into the trunk of his car

and taken to the desert, the evidence presented at trial supports a finding that a protracted and brutal struggle occurred at the murder scene that involved the infliction of numerous severe injuries upon the victim and culminated in her sexual assault and murder. The evidence also indicates that during this struggle the victim defecated on herself and on Petitioner, supporting a determination that she suffered extreme duress. All of this evidence, irrespective of counsel's alleged shortcomings, supported a finding of cruelty under Arizona law. *Id.* at 147, 945 P.2d at 1278 ("A finding of cruelty is warranted when the defendant inflicts on the victim mental anguish or physical abuse before the victim's death."). Consequently, Petitioner cannot establish prejudice from counsel's alleged failures, and the PCR court's denial of relief on this claim was neither contrary to nor an unreasonable application of *Strickland.*

**Claim 6: The Court Found Non–Statutory Aggravation; Namely that Kidnapping was an Aggravating Factor Justifying the Death Penalty**

**Claim 7: The Court Wrongfully Believed that Petitioner Had to Prove He Was Intoxicated at the Time of the Murder for His Longstanding Alcoholism and Drug Addiction to Be Considered a Mitigating Circumstance**

**Claim 8: The Court Failed to Weigh A.R.S. § 13–703(G)(1) in the Disjunctive**

**Claim 4.3–B: Appellate Counsel was Ineffective for Failing to Challenge the Sentence of the Court for the Reasons Stated in Claims 6, 7, and 8**

In Claims 6, 7, and 8, Petitioner presents three claims relating to the trial judge's findings at sentencing. (Dkt. 38 at 107–12.) In Claim 4.3–B, Petitioner asserts ineffective assistance of appellate counsel for failing to raise on appeal the issues presented in Claims 6, 7, and 8. (*Id.* at 98.)

*Procedural Status*

 The substantive errors raised as Claims 6, 7, and 8 were never presented on direct appeal. Instead, Petitioner presented them in his PCR petition. (Dkt. 63, Ex. G at 59–63.) Although the PCR court addressed the merits of these claims, it first found each waived because they could have been raised on appeal. (Dkt. 63, Ex. D at 16–18.) Thus, the state court "explicitly invoke[d] a state procedural bar as a separate basis for decision." *Harris v. Reed,* 489 U.S. at 264 n. 10, 109 S.Ct. 1038. This preclusion ruling rests on an independent and adequate state procedural bar. *See Smith,* 536 U.S. at 860, 122 S.Ct. 2578; *Ortiz,* 149 F.3d at 931–32. Therefore, Claims 6, 7, and 8 are procedurally barred, absent a showing of cause and prejudice or a fundamental miscarriage of justice.

Petitioner has not asserted cause for his failure to properly exhaust Claims 6, 7, and 8; nor has he attempted to demonstrate that a fundamental miscarriage of justice will occur if these claims are not addressed on the merits. Although Petitioner does not expressly assert appellate IAC as cause, the allegations set forth in Claim 4.3–B were themselves properly exhausted during his PCR proceedings and, if meritorious, could potentially serve as cause to overcome the default of Claims 6, 7, and 8. Therefore, the Court determines whether counsel was ineffective for failing to raise these claims on appeal.

*Non–Statutory Aggravation*

 Petitioner asserts that the trial court relied on kidnapping of the victim as

an improper non-statutory aggravating factor. (Dkt. 38 at 107–08.) He notes that Arizona law provides that only proven statutory aggravating factors may support a death sentence and that the use of a non-statutory factor violates his rights under the Fifth, Eighth, and Fourteenth Amendments. (*Id.*) He also questions the sufficiency of the evidence regarding the kidnapping and asserts that appellate counsel was ineffective for not raising these issues on appeal. (*Id.* at 107–08, 98.)

To support his assertion that the sentencing court improperly considered his kidnapping conviction as a separate, non-statutory aggravator in imposing the death sentence, Petitioner cites the following language in the court's special verdict: "In this case I do find that there are aggravating circumstances, I find that the offense was committed in an especially cruel manner and I find that there was what I call earlier the classical or common law kidnaping." (RT 12/21/94 at 31.)

The PCR court rejected the allegation that the sentencing judge had improperly "found kidnapping as an aggravating factor." (Dkt. 63, Ex. D at 16.) This Court agrees. Despite any awkwardness or lack of clarity in the sentencing court's language, a fair reading of the reference to Petitioner's kidnapping conviction in the special verdict shows that it was made in the context of the court's assessment of the "cruelty" statutory aggravator. (*Id.* at 31–32.) The court's reference to Reid's abduction was part of its evaluation of the evidence in support of the State's assertion that her murder satisfied the cruelty prong of the (F)(6) factor. Petitioner's assertion that the court considered and weighed an inappropriate non-statutory aggravating factor beyond the "cruelty" aggravator of A.R.S. § 13–703(F)(6) is without merit. Therefore, appellate coun-sel was not ineffective for failing to raise this claim on appeal.

Even if not considered as a separate aggravator, Petitioner argues there was insufficient evidence to support the sentencing judge's finding, with respect to the (F)(6) cruelty factor, that he kidnapped Reid. To this end, he notes that the blood found in his trunk "could not be identified as being any particular person's blood" and that the only evidence beyond the blood was testimony from "drinking buddies" that Reid rarely accepted rides home and never from strangers. (Dkt. 38 at 107–08.) The Court disagrees.

As explained in Claim 5, there was sufficient evidence to establish cruelty beyond a reasonable doubt regardless of whether Reid was kidnapped. In particular, Petitioner's own admission that he beat Reid, which was corroborated by evidence at the murder scene of a violent confrontation, as well as the fact that she suffered multiple injuries and defecated during the assault, supports a finding under Arizona law that the victim experienced severe mental and physical anguish prior to the infliction of the fatal blows to her head. The Court concludes that the Arizona Supreme Court would have upheld the cruelty finding on appeal regardless of whether appellate counsel had argued there was insufficient evidence of kidnapping.

*Substance Abuse as Mitigation*

At the presentencing hearing, Dr. Flynn testified about Petitioner's emotional and cognitive traits. He indicated that Petitioner began drinking at a young age, perhaps as early as age twelve. (RT 11/28/94 at 12.) From interviews with family and friends, Dr. Flynn believed the drinking "intensified" in recent years and that Petitioner suffered from "physiological" alcoholism, a condition in which a person has a "pre-disposition to develop a need for alcohol." (*Id.* at 13.) An alcoholic of this type

can experience "blackouts" and "energized" behavior which rapidly fades. (*Id.* at 14–17.) Dr. Flynn noted that alcohol abuse is "very strongly correlated with violent behavior" and noted some indication of such conduct by Petitioner, including "verbally" intimidating a prostitute to have sex with him without charge and punching his fist through a window at a fast food restaurant. (*Id.* at 24.)

On cross-examination, Dr. Flynn stated that Petitioner did not have a personality disorder, that he suffered from no cognitive defect which prevented him from knowing right from wrong or from conforming his behavior to the law, that he had no emotional disorder, and that he had not suffered any dramatic family abuse. (RT 11/28/94 at 44–45.)

In its special verdict, the court stated:

On the intoxication, the defendant's history of intoxication is long, longstanding. There was substance abuse for certainly close to ten years of his life at the time that he committed this offense. He was age 22 at the time that this offense was committed.

But again *I don't believe that the intoxication or substance abuse impaired his ability and capacity to appreciate the wrongfulness of his conduct to any significant degree.* And in that I take into consideration that when he was stopped approximately 30 minutes from the time the crime was committed by the police and photographs were taken at the corner of Broadway and Church here in Tucson, Arizona, and the officers were repeatedly asked whether there was any evidence of intoxication, and they repeatedly said nothing of any significance.

I am trying to remember whether they—yes, there might have been the smell of some alcohol but his conduct was such that it would not indicate that he was intoxicated. So I don't think that intoxication at all is any sort of a mitigating factor.

(RT 12/21/94 at 34 (emphasis added).) On appeal, the Arizona Supreme Court acknowledged Petitioner's long-time substance abuse problems, but declined to conclude that he was impaired by alcohol consumption to such an extent that it interfered with his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law's requirements. *Spreitz,* 190 Ariz. at 149–50, 945 P.2d at 1280–81.

■ Petitioner argues that the sentencing judge erred in not finding that he was intoxicated when he murdered the victim and that the court confused the two distinct issues of whether Petitioner was intoxicated at the time of the offense and whether his longstanding alcoholism and substance abuse could constitute a mitigating factor. (Dkt. 38 at 109.) He faults appellate counsel for not raising these issues on appeal. (*Id.* at 98.) The PCR court, in denying relief on the "failure to consider" allegation, noted that a sentencing court "can and should consider an individual's long-term alcoholism and substance abuse" as non-statutory mitigation. It further stated, however, that such evidence is "inconsequential" if it fails to explain the person's behavior at the time of the offense. (Dkt. 63, Ex. D at 17.) The PCR court concluded that "there is no evidence in Petitioner's case to suggest that he suffered any long-term effects from his alcohol or drug abuse that precluded him from controlling his behavior." (*Id.*)

■ In a capital case, the sentencing court may not refuse to consider, as a matter of law, any relevant mitigating evidence. *See Eddings v. Oklahoma,* 455 U.S. 104, 113–14, 102 S.Ct. 869, 71 L.Ed.2d

1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *see also Tennard v. Dretke,* 542 U.S. 274, 283, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) (reiterating that a sentencer may not be prevented from considering and giving effect to relevant mitigating information). Nor may the sentencing court confine its consideration of mitigating evidence only to specific factors listed in a statute. *Hitchcock v. Dugger,* 481 U.S. 393, 398–99, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). Constitutionally relevant mitigating evidence consists of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett,* 438 U.S. at 604, 98 S.Ct. 2954. Provided the sentencing court has not refused to consider relevant evidence, it is not required to find proffered evidence mitigating, nor must the court accord such evidence the weight which a defendant believes is appropriate. *Tuilaepa v. California,* 512 U.S. 967, 979–80, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); *Eddings,* 455 U.S. at 114–15, 102 S.Ct. 869.

▮▮ Under Arizona's capital sentencing statute, the sentencing court shall consider as mitigating circumstances

any factors that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, *including but not limited to the following:*

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

A.R.S. § 13–703(G) (emphasis added). Furthermore, although mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, the Arizona Supreme Court has held that the lack of a causal connection may be considered in assessing the weight of the evidence. *State v. Newell,* 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006); *State v. Hampton,* 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty and not sufficiently substantial to call for leniency, in part, because not tied to the offense). When the evidence establishes that a defendant "knew right from wrong and could not establish a causal nexus between the mitigating factors and [the] crime," limited value may be accorded to evidence of abusive childhood, personality disorders, and substance abuse. *State v. Johnson,* 212 Ariz. 425, 440, 133 P.3d 735, 750 (2006).

After considering Petitioner's arguments in Claim 7, this Court concludes that Petitioner cannot establish appellate ineffectiveness based on counsel's failure to raise these concerns to the state supreme court. The trial judge's rejection of Petitioner's claim of intoxication was reasonable in light of the evidence presented at trial, especially the testimony of police officers who encountered Petitioner shortly after he committed the crime and Petitioner's detailed recollection of the murder, which was corroborated by evidence at the crime scene. In addition, the Arizona Supreme Court independently reviewed the record to determine the existence of mitigating factors and found "no basis on which to alter the sentencing judge's decision." *Spreitz,* 190 Ariz. at 149, 945 P.2d at 1280. This review included consideration of Petitioner's allegations of impairment at the time of the crime. Thus, Petitioner cannot establish prejudice from appellate counsel's failure to specifically argue to the Arizona Supreme Court that the evidence established he was intoxicated when he murdered the victim.

■ With regard to long-term substance abuse as a mitigating factor, it is well established that, so long as mitigating evidence is considered, a state is free to determine the weight it will assign to such evidence. *Harris v. Alabama,* 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (stating that the Constitution does not require that a specific weight be given to any particular mitigating factor). Arizona has chosen to assign little value to a history of alcohol abuse if it is not shown that this background contributed to a defendant's conduct at the time of the crime. *Newell,* 212 Ariz. at 405, 132 P.3d at 849; *Johnson,* 212 Ariz. at 440, 133 P.3d at 750. In its special verdict, the sentencing judge specifically noted that Petitioner's history of substance abuse was "longstanding" and had existed for close to ten years prior to the murder. (RT 12/21/94 at 34.) Although the court ultimately concluded that Petitioner's history of substance abuse was not weighty because it lacked a causal connection to the offense, it is clear the court *considered* this evidence. *See Parker v. Dugger,* 498 U.S. 308, 315, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) ("We must assume the trial judge considered all this [mitigation] evidence before passing sentence. For one thing, he said he did."); *see also Lopez v. Schriro,* 491 F.3d 1029, 1037 (9th Cir.2007), *cert. denied,* — U.S. ——, 128 S.Ct. 1227, 170 L.Ed.2d 140 (2008) (rejecting a claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant). Because the trial court's consideration of Petitioner's history of substance abuse comported with both Arizona and federal law, appellate counsel's failure to raise this issue on appeal does not constitute ineffectiveness.

*Failure to Fully Consider A.R.S. § 13–703(G)(1)*

■ Under A.R.S. § 13–703(G)(1), a mitigating circumstance exists if a "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Petitioner contends that in assessing whether his "subnormal" and "disruptive" childhood satisfied the (G)(1) factor, both the sentencing court and the Arizona Supreme Court considered only the first prong—whether his dysfunctional upbringing impacted his ability to appreciate the wrongfulness of his conduct. He argues that the courts failed to consider the second prong—whether his troubled childhood impacted his ability to conform his conduct to the requirements of the law. (Dkt. 38 at 111–12.) He complains that appellate counsel was ineffective for not raising this claim on appeal. (*Id.* at 98.)

With regard to Petitioner's upbringing, the sentencing court stated in its special verdict:

In mitigation: many factors have been submitted in mitigation. One is an extremely disruptive childhood. I think that Dr. Flynn's report worded it well. Let's see if I can find that report now. In part Dr. Flynn in his report on page eight said, quote, Christopher Spreitz did not suffer acute dramatic abuse in his family home. He did suffer pervasive substantial emotional battering and neglect along with inattention to his developmental needs. None of the available information suggests the home environment was an amenably healthy one for the developing children. End quote.

And I think that the point that I want to make is that the home was a subnormal home. And obviously Mr. Spreitz suffered a disruptive childhood with a punitive cold mother, poor social judgment, drinking from the age often on, a mother that he could not please no matter what he did; the defendant, his life turned to substance abuse, alcohol and there is some suggestion that he was using cocaine or other drugs.

However, I don't find that that history is a mitigating factor *that impaired his ability to make a judgment as to whether he was acting rightly or wrongly* in the death of the victim in this case.

(RT 12/21/94 at 33–34 (emphasis added).)

On appeal, the Arizona Supreme Court affirmed the trial court's findings and conclusions:

We agree with the sentencing judge that defendant's upbringing was subnormal. The record supports the judge's conclusion that defendant's home life was sadly lacking and that his mother's erratic behavior toward defendant inhibited his emotional and developmental skills. We also find significant the conclusions of the psychologist testifying on defendant's behalf at the sentencing hearing, who stated that defendant "did not suffer acute, dramatic abuse." Although we recognize defendant's upbringing as a mitigating circumstance, we accord it little weight. While defendant's inadequate upbringing may have contributed to his emotional immaturity and undeveloped humanitarian skills, we concur with defendant's statement at his sentencing hearing that "people that have had as bad a background or worse haven't killed. And I don't want what everyone has said about my background to be an excuse for what's happened."

. . .

The sentencing judge found that defendant's ability to appreciate the wrongfulness of his conduct was not impaired on the night of the murder to any significant extent by substance abuse, emotional disorders, situational stress, or by a combination of these. Our review of the record convinces us that the trial court's finding was proper. In fact, Dr. Flynn, the forensic psychologist who testified for defendant at the sentencing hearing, advised the court that defendant did not suffer from an emotional disorder or any cognitive disorder affecting his ability to distinguish right from wrong *or to conform his behavior to the law.*

*Spreitz,* 190 Ariz. at 149–50, 945 P.2d at 1280–81 (emphasis added).

It is evident that the Arizona courts considered both prongs of the (G)(1) diminished capacity factor in assessing Petitioner's proffered mitigating evidence. The fact that they did not expressly repeat, word for word, the language of (G)(1) does not suggest that they failed to consider and give effect to the proffered evidence. *See Moormann v. Schriro,* 426 F.3d 1044, 1055 (9th Cir.2005) ("the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant'") (quoting *Clark v. Ricketts,* 958 F.2d 851, 858 (9th Cir.1991)); *see also Jeffers v. Lewis,* 38 F.3d 411, 418 (9th Cir.1994) (en banc) (when it is evident that all mitigation evidence was considered, the federal constitution does not require that the trial court "exhaustively document its analysis of each mitigating factor"). Moreover, there is nothing in the record to suggest that Petitioner's difficult upbringing impacted his ability to conform his conduct to the law. On the contrary, as noted by the Arizona Supreme Court, Petitioner's own

expert testified that Petitioner did not suffer from any emotional or cognitive disorders that would satisfy the (G)(1) factor. *Spreitz,* 190 Ariz. at 150, 945 P.2d at 1281. Therefore, appellate counsel was not ineffective for failing to raise this issue on appeal or in a motion for reconsideration to the state supreme court.

*Conclusion*

Petitioner has failed to establish constitutional ineffectiveness from appellate counsel's failure to raise Claims 6, 7, and 8 on appeal. Therefore, Petitioner has failed to establish cause and prejudice to overcome the procedural default of these claims and is not entitled to habeas relief on the IAC allegations set forth in Claim 4.3–B.

**Claim 9: Petitioner's Sentence of Death Violates the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment**

Petitioner raises a series of challenges to the death penalty and Arizona's death sentencing scheme. The claims were presented on direct appeal and rejected by the Arizona Supreme Court. *Spreitz,* 190 Ariz. at 151, 945 P.2d at 1282. For the reasons discussed below, they are without merit.

*The Death Penalty is Cruel Under Any Circumstance*

■ Petitioner, citing no authority save Justice Brennan's dissent in *Walton,* 497 U.S. at 674–77, 110 S.Ct. 3047, argues that the death penalty is cruel under any circumstance and therefore violates the Eighth Amendment. (Dkt. 38 at 113.) The Arizona Supreme Court denied this claim in summary fashion, citing *Gulbrandson,* 184 Ariz. at 72–73, 906 P.2d at 605–06, which in turn cited *Gregg v. Georgia,* 428 U.S. 153, 186–87, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *Spreitz,* 190 Ariz. at

151, 945 P.2d at 1282. This ruling was neither contrary to nor an unreasonable application of controlling Supreme Court law. *See Gregg,* 428 U.S. at 187, 96 S.Ct. 2909 ("[T]he infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe.").

*Arizona's Method of Inflicting Death is Cruel and Unusual*

■ Petitioner contends that Arizona's method of execution violates the federal constitution because it forces him to choose between death by lethal gas and death by lethal injection and because either form of execution inflicts unnecessary pain. (Dkt. 38 at 113–14.) The Arizona Supreme Court rejected this claim, citing *State v. Spears,* 184 Ariz. 277, 291, 908 P.2d 1062, 1076 (1996). *Spreitz,* 190 Ariz. at 151, 945 P.2d at 1282.

As noted by Respondents, Arizona law does not require a defendant to pick his method of execution. If no selection is made, death by lethal injection is the prescribed method. *See* A.R.S. § 13–757(B). Thus, Petitioner is not "required" to make a choice or be an active participant in his own death. Petitioner cites no Supreme Court precedent to support his assertion that execution by lethal injection is inherently cruel and unusual punishment in violation of the Eighth Amendment. In *LaGrand v. Stewart,* 133 F.3d 1253, 1265 (9th Cir.1998), the Ninth Circuit rejected a claim that execution by lethal injection is per se unconstitutional. More recently, in *Baze v. Rees,* —— U.S. ——, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), the Supreme Court upheld the constitutionality of Kentucky's method of lethal injection. The decision of the Arizona Supreme Court rejecting this claim was neither contrary to nor an unreasonable application of clearly established federal law.

*Mandatory Imposition of Death Penalty*

 Petitioner argues that Arizona's sentencing scheme is unconstitutional because it mandates that a death sentence be imposed whenever an aggravating circumstance and no mitigating circumstances are found. (Dkt. 38 at 114.) The Arizona Supreme Court denied this claim in summary fashion, citing *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995), which in turn cited *Walton*, 497 U.S. at 651–52, 110 S.Ct. 3047. *Spreitz*, 190 Ariz. at 151, 945 P.2d at 1282.

In *Walton*, four justices held that the Arizona death penalty statute does not "[create] an unconstitutional presumption that death is the proper sentence." *Id.* (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (Pennsylvania statute requiring imposition of the death penalty if aggravating circumstances are found to exist and no mitigating circumstances are found to exist held constitutional), and *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). Four dissenters disagreed. *Walton*, 497 U.S. at 687–88, 110 S.Ct. 3047 (Blackmun, J., dissenting). However, in a concurring opinion, Justice Scalia agreed, for different reasons, that the mandatory nature of the Arizona death penalty statute did not violate the Eighth Amendment:

> The mandatory imposition of death—without sentencing discretion—for a crime which States have traditionally punished with death cannot possibly violate the Eighth Amendment, because it will not be "cruel" (neither absolutely nor for the particular crime) and it will not be "unusual" (neither in the sense of being a type of penalty that is not traditional nor in the sense of being rarely or "freakishly" imposed).

*Id.* at 671, 110 S.Ct. 3047 (Scalia, J., concurring). Therefore, the determination of the Arizona Supreme Court rejecting this claim was not contrary to nor an unreasonable application of controlling Supreme Court law.

*Death Qualifying the Sentencing Judge*

 The federal constitution requires only that a defendant receive a fair trial before a fair and impartial judge with no bias or interest in the outcome. *Bracy v. Gramley*, 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). Petitioner makes no allegation of bias or interest on behalf of the judge who presided at his trial and sentencing. Nor does he cite authority, let alone Supreme Court precedent, to support his assertion that the federal constitution affords him the right to voir dire a sentencing judge to determine his or her view on the death penalty. The decision of the Arizona Supreme Court denying this claim was neither contrary to nor an unreasonable application of controlling Supreme Court law.

*Lack of Guidance for Sentencing*

Petitioner complains that Arizona's capital sentencing scheme fails to sufficiently channel the sentencing court's discretion and to provide objective standards for weighing aggravation and mitigation. (Dkt. 38 at 115–16.) The Arizona Supreme Court rejected these claims, citing *State v. Spears*, 184 Ariz. at 291, 908 P.2d at 1076, and *State v. Roscoe*, 184 Ariz. 484, 501, 910 P.2d 635, 652 (1996). *Spreitz*, 190 Ariz. at 151, 945 P.2d at 1282.

 In order for a capital sentencing scheme to pass constitutional muster, it must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of" the capital crime. *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235

(1983). A death penalty scheme must provide an "objective, evenhanded and substantively rational way" for determining whether a defendant is eligible for the death penalty. *Id.* at 879, 103 S.Ct. 2733. Defining specific "aggravating circumstances" is the accepted "means of genuinely narrowing the class of death-eligible persons and thereby channeling the [sentencing authority's] discretion." *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Such a circumstance must meet two requirements. First, "the [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630; *see Arave v. Creech,* 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993). Second, "the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630; *see Arave,* 507 U.S. at 473, 113 S.Ct. 1534; *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

 In addition to the requirements for determining eligibility for the death penalty, the Supreme Court has imposed a separate requirement for the selection decision, "where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant,* 462 U.S. at 879, 103 S.Ct. 2733. Accordingly, a statute which "provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage" will ordinarily meet constitutional concerns, 462 U.S. at 879, 103 S.Ct. 2733, so long as a state ensures "that

the process is neutral and principled so as to guard against bias or caprice." *Tuilaepa,* 512 U.S. at 973, 114 S.Ct. 2630.

 Arizona's death penalty statute allows only certain, specific aggravating circumstances to be considered in determining eligibility for the death penalty. A.R.S. § 13–703(F). "The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencing authority]." *Blystone v. Pennsylvania,* 494 U.S. at 306–07, 110 S.Ct. 1078. In addition, Arizona's capital sentencing statute requires the sentencing court to consider as mitigating circumstances "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." A.R.S. § 13–703(G). Because it provides for "categorical narrowing" at the definition stage and for an "individualized determination" at the selection stage, Arizona's death penalty scheme is not unconstitutional. The determination of the Arizona Supreme Court rejecting these claims was neither contrary to nor an unreasonable application of controlling Supreme Court law.

*Mitigation Burden of Proof*

As noted by Petitioner himself (Dkt. 38 at 115), the Supreme Court has specifically rejected this claim. *Walton,* 497 U.S. at 649–51, 110 S.Ct. 3047; *see also Delo v. Lashley,* 507 U.S. 272, 275–76, 113 S.Ct. 1222, 122 L.Ed.2d 620 (1993) (*Walton* establishes "that a State may require the defendant 'to bear the risk of nonpersuasion as to the existence of mitigating circumstances.' "). The Arizona Supreme

Court's denial of this claim was neither contrary to nor an unreasonable application of controlling Supreme Court authority.

*Lack of Specific Mitigation Findings & Cumulative Consideration*

 Petitioner cites no authority to support his claim that the sentencing court violates the federal constitution if it fails to make specific findings as to each proffered mitigator. On the contrary, the Ninth Circuit has held that "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.'" *Moormann*, 426 F.3d at 1055 (quoting *Clark*, 958 F.2d at 858). On the issue of considering Petitioner's proffered mitigation cumulatively, aside from any constitutional question, the Arizona Supreme Court specifically stated that it considered Petitioner's mitigating circumstances cumulatively in its independent review of the sentence. *Spreitz*, 190 Ariz. at 152, 945 P.2d at 1283. Thus, assuming the sentencing court erred in failing to consider the mitigation cumulatively, and that this error violated Petitioner's constitutional rights, the error was cured by the Arizona Supreme Court's independent review. *See Clemons v. Mississippi*, 494 U.S. 738, 750, 754, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (holding that appellate courts are able to fully consider mitigating evidence and are constitutionally permitted to affirm a death sentence based on independent re-weighing despite any error at sentencing).

*Lack of Burden on State to Prove Death is Appropriate*

 As previously discussed, Arizona's death penalty scheme allows certain, statutorily-defined aggravating circumstances to be considered in determining eligibility for the death penalty. For death to be an appropriate sentence, at least one aggravating factor must be found and the court must determine that mitigating factors do not warrant a lesser sentence. *See* A.R.S. § 13–703(E). This scheme has been found constitutionally sufficient. *See Jeffers*, 497 U.S. at 774–77, 110 S.Ct. 3092; *Walton*, 497 U.S. at 649–56, 110 S.Ct. 3047; *Woratzeck*, 97 F.3d at 334–35; *Smith*, 140 F.3d at 1272. The determination of the Arizona Supreme Court rejecting this claim was neither contrary to nor an unreasonable application of controlling Supreme Court law.

*Mitigation Evidence Not Fully Considered*

 Petitioner asserts that his constitutional rights were violated because Arizona law requires him to prove mitigating circumstances by a preponderance of the evidence and further requires that mitigation be "sufficiently substantial" to warrant leniency. (Dkt. 38 at 119.) Again, the United States Supreme Court has upheld the constitutionality of Arizona's death penalty sentencing scheme, including its requirement that Petitioner bear the burden of proving mitigating circumstances sufficiently substantial to call for leniency. *See Walton*, 497 U.S. at 650, 110 S.Ct. 3047. The decision of the Arizona Supreme Court denying relief on this claim was neither contrary to nor an unreasonable application of controlling Supreme Court law.

*Lack of Prosecutorial Standards*

 A statutory scheme for imposing a death sentence may not be unguided and arbitrary. *See Gregg*, 428 U.S. at 206, 96 S.Ct. 2909; *Zant*, 462 U.S. at 877, 879, 103 S.Ct. 2733. As long as the system has safeguards to ensure this, it passes constitutional muster. Arizona's statutory

scheme meets this test. Petitioner cites no authority to support his contention that a statutory scheme is unconstitutional simply because it does not have specified curbs on the discretion of a prosecutor in deciding whether to seek a death sentence, particularly in light of the requirements placed upon the sentencing court in determining whether to impose a death sentence. The decision of the Arizona Supreme Court denying this claim was neither contrary to nor an unreasonable application of controlling Supreme Court law.

### Discriminatory Application

 Clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (quoting *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)). Therefore, to prevail on this claim Petitioner "must prove that the decision makers in his case acted with discriminatory purpose." *Id.* Petitioner does not attempt to meet this burden. He offers no evidence specific to his case that would support an inference that his sex or economic status played a part in his sentence. *See Richmond v. Lewis,* 948 F.2d 1473, 1490–91 (9th Cir.1990), *vacated on other grounds,* 986 F.2d 1583 (9th Cir. 1993) (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socioeconomic background is insufficient to prove discriminatory purpose). The Arizona Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of controlling Supreme Court law.

### Improper Consideration of Presentence Report

 The trial court indicated that it read the PSR prior to sentencing. (RT 12/21/94 at 2.) The PSR recounted that the victim's sister, Susan Eddleman, told the report's author that the victim "never made it to forty years old, and my wish is that Mr. Spreitz does not either." (PSR at 5.) Eddleman also spoke at the sentencing hearing. In addition to recounting the effect her sister's murder had on her, she characterized Petitioner as a "monster" who "tortured" her sister before murdering her. She requested that he be sentenced to death. (RT 12/21/94 at 14, 16.)

Petitioner contends that the sentencing court's exposure to Eddleman's statements in the PSR and at sentencing created an "unacceptable risk" that the court was swayed to impose an arbitrary sentence in violation of Petitioner's constitutional rights. (Dkt. 38 at 121.) The Arizona Supreme Court summarily denied this claim, citing *State v. Spears,* 184 Ariz. at 292, 908 P.2d at 1077.[14]

In *Booth v. Maryland,* 482 U.S. 496, 509, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court held that the introduction of a victim impact statement during the sentencing phase of a capital case violated the Eighth Amendment. In *Payne v. Tennessee,* 501 U.S. 808, 827, 830 n. 2, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the

---

**14.** In *Spears,* the Arizona Supreme Court held that while testimony from family members of the victim regarding the appropriate sentence may violate the United States Constitution if presented to a capital sentencing jury, no violation occurs if presented to a sentencing judge because "we have generally assumed that the sentencing judge is capable of focusing on the relevant factors and setting aside the irrelevant, inflammatory, and emotional factors absent evidence to the contrary." 184 Ariz. at 292, 908 P.2d at 1077.

Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not erect a per se barrier to admission of victim impact evidence, but left intact *Booth*'s prohibition on the admissibility of opinions from the victim's family about the crime, the defendant, or the appropriate sentence.

██ Under Arizona law at the time of Petitioner's trial, the judge, rather than the jury, determined the penalty in a capital case. A.R.S. § 13–703. As the Arizona Supreme Court has explained, judges are presumed to know and apply the law. *Gulbrandson*, 184 Ariz. at 66, 906 P.2d at 599; *see Jeffers*, 38 F.3d at 415. Therefore, "in the absence of evidence to the contrary, [the Court] must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir.1997).

In its special verdict, the court recounted the evidence presented at trial involving the circumstances of the murder and concluded that the aggravating factor of cruelty under § 13–703(F)(6) had been satisfied. (RT 12/21/94 at 32–33.) The court then discussed the mitigating circumstances in detail, including Petitioner's subnormal childhood, his history of substance abuse and his intoxication the night of the crime, his "emotional growth" during incarceration, his age and immaturity, his lack of a criminal history or propensity for violence, and his potential for rehabilitation. (*Id.* at 33–36.) The court concluded that the mitigating factors did not "balance" the aggravation and sentenced Petitioner to death. (*Id.* at 36.)

Petitioner presents no evidence indicating the sentencing court was swayed by anything other than the appropriate criteria required in passing a death sentence. In fact, as just summarized, a review of the special verdict supports the conclusion that the state court's sentence of death was based solely on its findings that a statutory aggravating factor had been established based on the evidence presented at trial and that the mitigation evidence offered by Petitioner did not warrant a lesser sentence. (*See* RT 12/21/94 at 32–36.) Nothing in the court's rationale indicated that it was influenced by Eddleman's statements. In the absence of any clear indication that the court improperly considered those statements, this Court assumes that the trial judge followed the Arizona guidelines in passing sentence. *See Gretzler*, 112 F.3d at 1009.

Moreover, the Arizona Supreme Court on appeal reweighed the aggravating and mitigating evidence and independently determined that the death sentence was appropriate. *Spreitz*, 190 Ariz. at 152, 945 P.2d at 1283. In doing so, the court likewise predicated its determination solely on its conclusion that the aggravating factor of cruelty had been established and that the mitigation presented was "not sufficiently substantial" to warrant leniency. *Id.*

Because there is no evidence the state courts misapplied the law and improperly considered the statements of the victim's sister when imposing the death sentence, Petitioner cannot establish a constitutional violation. The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

### Claim 4.2–F: Sentencing Counsel was Ineffective With Regard to the Presentence Report

Petitioner contends that counsel's representation fell below objectively reasonable standards when, in relation to the PSR, he failed to (1) object to the probation officer's account of his interview with the

victim's sister, Susan Eddleman; (2) assist Petitioner in preparation for his interview with the probation officer; and (3) assist Petitioner in drafting an allocution letter to the sentencing judge. (Dkt. 38 at 92–95.) The PCR court specifically addressed only the second allegation, stating that Petitioner "cites no authority for this argument and the court finds that such a claim is without any merit whatsoever." (Dkt. 63, Ex. D at 12.)

*Background*

During her interview, Eddleman told the PSR author that she was devastated psychologically, emotionally, and physically by her sister's death. (PSR at 4.) Her sister's murder affected her so much that her marriage ended and she was unable to hold a job. (*Id.*) She described terrible nightmares "which I've had to express to my therapist to make sure I am sane." (*Id.*) She characterized her relationship with her sister, at least while growing up, as "extremely close," noting "our mother ran off and left us with our father, who at the age of twelve (me) my father died of cancer. We had five of the worst stepmothers Cinderella could only imagine." (*Id.* at 4–5) She stated that her sister never made it to age forty and she hoped Petitioner would not either. (*Id.* at 5.)

In the "Defendant's Statement" portion of the PSR, the probation officer recounted Petitioner's disbelief that he had killed Reid; Petitioner stated, "I was a private duty nurse, I increase life not take a life." (*Id.* at 4.) The PSR further quoted Petitioner as stating "a lady died, that really sucks. It was senseless that she died." (*Id.*)

In a letter to the sentencing judge, Petitioner recounted his life history, including his troubled childhood and family life, his substance abuse, and his hopes for the future. Petitioner also expressed remorse for killing Ruby Reid:

Knowing I was the cause of Ms. Reid's death is something I will have to live with. Believe me it's not an easy thing that I can just forget about. It does not matter that I am locked up. Even if I was free I would still think about her and know if it wasn't for me, she would be alive today.

(Dkt. 63, Ex. T at 2.) Petitioner closed his letter by stating:

Your Honor, I have tried to give you some idea of what I was and who I worked hard to become. Maybe you are thinking, this is all fine and dandy, but what about Ms. Reid? Like I said before, her death was senseless and I should accept responsibility and be held accountable. All I can do is work hard toward a positive goal. If I don't do that Ms. Reid's death will never make sense.

(*Id.* at 3.) Petitioner then wrote "P.S. I am truly sorry I have caused Ms. Reid's death, Your Honor." (*Id.*) At his sentencing allocution, Petitioner apologized for causing the victim's death. (RT 12/21/94 at 12.)

*Analysis*

Petitioner argues that the information recounted in Eddleman's "victim impact statement" was prejudicial and unfounded. (Dkt. 38 at 93.) He asserts that if counsel had investigated Eddleman he would have discovered there was virtually no contact between her and Reid, and that Reid changed her name to avoid contact with her family. He also contends Eddleman cared little about the Reid's alcoholism and poverty. (*Id.*)

 Petitioner cannot establish either deficient performance or prejudice as a result of counsel's failure to object to Eddleman's statements in the PSR. The report merely recounts Eddleman's an-

guish at her sister's death. Although Petitioner contends that Eddleman's suggestion that she and Reid were "extremely close" is misleading, this assertion is unsubstantiated. While Eddleman told the PSR author they were extremely close (PSR at 4), at trial she testified that she had not actually seen Reid in ten years, but stated they talked on the phone "all the time." (RT 8/10/94 at 318.) These statements are not incompatible. During her trial testimony, Eddleman also explained Reid's name change, stating that her sister changed her name in order to forget a troubled adolescence. Their mother abandoned them when they were children and their father died, leaving them to be raised by a stepmother who treated them terribly. (*Id.* at 319.) It was Reid's traumatic relationship with her stepmother, not adverse feelings toward Eddleman, that led her to adopt a new name. (*Id.*)

Petitioner cites no evidence to support his assertion that Eddleman and Reid were not close, particularly while growing up, or that Eddleman did not care about Reid's personal struggles. Counsel could reasonably have concluded that there was no basis for objecting to these statements and that such an objection would not have succeeded. *See United States v. Popoola,* 881 F.2d 811, 813 (9th Cir.1989) (defendant's "conclusory allegations of inaccuracies in the [presentence] report are unsupported and do not suggest the report as a whole is misleading"), *overruled on other grounds by Lozada v. Deeds,* 964 F.2d 956 (9th Cir.1992).

More importantly, as previously noted, nothing in the record indicates that Eddleman's statement improperly swayed the court to impose the death penalty. The court weighed the aggravating factor of cruelty against the mitigation presented by Petitioner and concluded that a death sentence was appropriate. (RT 12/21/94 at 31–36.) In making such an assessment, the court was not prohibited from considering a family member's impact evidence as long as it did not also consider that person's opinions about the crime, the defendant, or the appropriate sentence. *See Payne,* 501 U.S. at 827, 830 n. 2, 111 S.Ct. 2597. Nothing in the record indicates the sentencing court considered any inappropriate statements by Eddleman in determining sentence. (*See* RT 12/21/94 at 31–36.)

Finally, even if counsel had objected to Eddleman's statements and they had been deleted from the PSR, there is no reasonable probability this would have resulted in the court giving Petitioner a lesser sentence. Much of the evidence in the PSR was recounted elsewhere in the record. For instance, as just noted, in her testimony at trial and sentencing, as well as in the letter she wrote to the court, Eddleman expressed many of the same sentiments Petitioner found objectionable in the PSR. (*See* RT 8/10/94 at 318–19; RT 12/21/94 at 14–16; PSR, Attached Letter from Susan Eddleman.)

■ Petitioner also claims that counsel was ineffective in failing to prepare him for the presentence interview with the probation officer and in failing to assist him with the letter he wrote to the judge prior to sentencing. As a result of counsel's deficiencies, Petitioner contends, the statements he made to the PSR author and in the letter to the judge were inadequate to express his true remorse. (Dkt. 38 at 94–95.)

Petitioner provides no affidavits from counsel or anyone else to support his assertion that counsel offered him no assistance or that he even sought counsel's help with respect to these matters. Such unsupported, conclusory assertions are insufficient to establish ineffective assistance of

counsel. In addition, even if counsel did nothing to assist him in these endeavors, Petitioner cannot establish prejudice.

Though perhaps inarticulate and inelegant, Petitioner's statements, considered in context, do not portray him as lacking remorse or unable to appreciate the wrongfulness of his conduct. To the contrary, Petitioner's full statement, as recounted in the PSR, indicates remorse for the killing. At the sentencing hearing, he repeated that he was sorry for causing the victim's death and apologized to her family. (RT 12/21/94 at 12.) He also reiterated remorse in his letter to the judge. (Dkt. 38, Ex. T at 2, 3.) Thus, the record is replete with examples of Petitioner indicating his regret and remorse for killing Reid. For that reason, even assuming counsel did nothing to aid Petitioner in preparing for his presentence interview or in writing his letter to the judge, his claims that counsel could have helped him do better are purely speculative.

Finally, there is no reasonable probability that had Petitioner been more eloquent in his expressions of remorse, he would have received a lesser sentence. Although the sentencing court did not directly comment on Petitioner's remorse as a mitigating factor, the Arizona Supreme Court specifically considered the issue and found it less than compelling in light of Petitioner's failure to report the crime when presented with the opportunity to do so. *Spreitz*, 190 Ariz. at 150–51, 945 P.2d at 1281–82.

For all of these reasons, the determination of the state court denying these claims was neither contrary to nor an unreasonable application of *Strickland*. Claim 4.2–F is denied.

### CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims. Therefore, Petitioner's Amended Petition for Writ of Habeas Corpus will be denied and judgment entered accordingly.

### CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that otherwise might be consumed drafting an application for a certificate of appealability to this Court, the Court on its own initiative has evaluated the claims within the Amended Petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir.2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 1,

4.1–A, 4.2–B, 4.2–C, 4.2–D, and 4.2–E. The Court therefore grants a certificate of appealability as to these claims. For the reasons stated in this Order and in the Court's May 2005 Order addressing Petitioner's Renewed Motion for Evidentiary Hearing filed (Dkt. 89), the Court declines to issue a certificate of appealability for Petitioner's remaining claims and procedural issues.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 38) is denied. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by the Court on April 29, 2002 (Dkt. 3) is **VACATED.**

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues:

Whether Claim 1, alleging a violation of Petitioner's right to a speedy trial, fails on the merits.

Whether Claim 4.1–A, alleging ineffective assistance of counsel for failing to raise a timely speedy trial right claim, fails on the merits.

Whether Claim 4.2–B, alleging ineffective assistance of counsel for failing to present at sentencing evidence to humanize Petitioner, fails on the merits.

Whether Claim 4.2–C, alleging ineffective assistance of counsel for failing to present at sentencing evidence of Petitioner's history of head injuries, fails on the merits.

Whether Claim 4.2–D, alleging ineffective assistance of counsel for failing to present at sentencing evidence of Petitioner's childhood abuse, fails on the merits.

Whether Claim 4.2–E, alleging ineffective assistance of counsel for failing to present at sentencing evidence of Petitioner's intoxication, fails on the merits.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501W. Washington, Phoenix, AZ 85007–3329.